**UNITED STATES of America, Appellee,**

v.

**Louis Benedict GWIN, a/k/a Bill Red Cloud, Appellant.**

No. 87–5257.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 15, 1987.

Decided Feb. 17, 1988.

Reed Rasmussen, Aberdeen, S.D., for appellant.

Philip N. Hogen, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY and MAGILL, Circuit Judges.

LAY, Chief Judge.

Louis Benedict Gwin a/k/a Bill Red Cloud was convicted in federal district court[1] on two counts of embezzling money of the United States Government in violation of 18 U.S.C. § 641 (1982).[2] He received concurrent sentences of two years imprisonment and was ordered to make restitution in the amount of $9,973. On appeal Gwin asserts inter alia that the evidence was insufficient to establish that any money taken by Gwin was property "of the United States." Gwin also raises other issues relating to the jury instructions, the use of an uncounseled conviction, and the multiplicitous nature of the indictment.

1. The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

2. The statute states:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641.

Each of these issues raises serious questions which we need not resolve; we agree with Gwin that the undisputed proof demonstrates that the monies involved were not property of the government under section 641. We conclude the government's proof demonstrates only that Gwin was a debtor of the government and cannot be guilty of embezzling government monies.

According to the government's evidence, in 1983 Gwin approached officers of the Indian Health Service (IHS), an agency of the United States, and offered to dispose of their exposed and obsolete X-ray film in the area of Aberdeen, South Dakota, and reclaim the silver for salvage value. According to their agreement, the defendant would obtain the film from the several hospitals and service units in the Aberdeen area, reclaim the silver therefrom, and then pay IHS for the film by remitting the proceeds to Picker International X-ray Company (Picker) a supplier of X-ray film for IHS. The payment procedure was devised because if IHS received the proceeds directly it would have to turn the proceeds over to the United States Treasury. IHS officials evidently approved the procedure so that the IHS could be given credit on its account with Picker for the purchase of new X-ray film.[3]

Written evidence of the arrangement is provided by two documents. The first document is a letter Gwin wrote in December of 1982 to officials of the IHS at Aberdeen. The government in its brief concedes: "The agreement was *memorialized* by a proposal from Red Cloud * * *." Appellee's Brief at 2 (emphasis added). The letter reads in part as follows:

I ask that this letter serve as my letter of intent *to purchase* all available used x-ray film in your area. It is my intent *to purchase* the film and have it reprocessed to remove the precious metals. I *offer to purchase* the film in large quanitites [sic] and pay your department a sum to be determined based on the daily silver market prices on the date of delivery to the processor.

Addendum Exhibit B (emphasis added). The government argues that the value to Gwin of the excess and obsolete X-ray film was to be negotiated in the future. On May 16, 1983, Curt Smith, IHS Radiology Consultant, wrote to all radiology branches. The letter reads in part:

The Area Office has decided *to sell* all of our old x-rays and silver reclaiming canisters in return for credit through Picker International X-ray Company to purchase x-ray like items from the proceedes [sic]. Mr. Bill Red Cloud who represents Delta Refining Company, will hire local help in purging the old x-rays for recycling under the supervision of the x-ray technologists. All weights will be recorded on site and forwarded to my office for a permanent record. We will receive the dollar amount based on the daily silver market value per troy once [sic] on the day of delivery to the processor.

Addendum Exhibit C (emphasis added).

No formal contract was drawn up setting out exactly what Gwin was to pay Picker after reclamation of the silver or what portion of the proceeds received would be retained by Gwin as his profit.

During the late spring and summer of 1983, Gwin travelled to various IHS facilities to pick up the outdated film. Gwin

3. A memo from the Director of Radiology of IHS concerning the procedure states in pertinent part:

This memo concerns the exchange of collected silver or old film silver for x-ray supplies or the development of credit with a company that can either purchase or supply x-ray supplies to the IHS facility. * * *

X-ray equipment or film companies can be used directly to collect the silver or to acquire credit for exchange for x-ray supplies. Some of the larger companies such as Kodak, Picker, or General Electric have silver collecting systems or will purchase silver so that credit with these companies can be used for securing x-ray supplies directly from them.

It should be understood that no checks or cash funds received for silver should be used for purchasing x-ray supplies. Funds should be turned over to GSA or the General Treasury. At the present time we are attempting to make an arrangement where cash funds can be retained within IHS for x-ray supplies. As yet, no general methodology has developed as to how this can be implemented.

Addendum Exhibit D.

sold the film he acquired to Tri–State Refining Company (Tri–State) of Sioux Falls, South Dakota on three separate occasions. In July of 1983 while he was collecting X-ray film from the IHS facility at Red Lake, Minnesota, Gwin was arrested by tribal authorities and charged with taking with intent to steal four cartons of new X-ray film. He was subsequently convicted of a misdemeanor in tribal court. On July 29, 1983, two days after his arrest, IHS withdrew from its agreement with Gwin. The record reflects that no money ever reached IHS or its supplier, and that Gwin utilized the proceeds he obtained from the sale of the silver to purchase personal items for himself and his wife.

After negotiations and efforts to obtain an accounting from Gwin were unsuccessful, the government filed this criminal action. The jury determined that the government never parted title with the X-ray film and that the funds received by Gwin were at all times owned by the government and misappropriated by Gwin.

In support of the jury's verdict, the government urges that Gwin was a bailee for sale, that any money paid to him by Tri–State was in fact government money, and that Gwin's failure to pay the IHS account at Picker was in fact embezzlement of government funds. The defendant on the other hand urges that he purchased the X-ray film involved and that his purchase price for the film was not to be paid to the government but to Picker for the government's account. He urges that he occupied the role of a debtor and that his intention was to pay the government from further sales to Tri–State. Under controlling legal standards we fail to find sufficient evidence to sustain the government's theory that Gwin received the film and the proceeds as a bailee for sale. The undisputed evidence demonstrates only that Gwin purchased the film from the government and agreed to pay a portion of the proceeds from the silver reclamation to Picker as consideration for the film purchased.

The evidence is clear that IHS and Gwin reached no definite understanding as to the amount to be paid to the government. The evidence indicates only that this amount was to be determined based upon the market price of silver and the amount reclaimed. Contrary to the government's directive, IHS facilities did not keep track of the amount of film provided to Gwin. Gwin voluntarily submitted the quantities of film from his records. No details were agreed upon as to the procedure to be followed by Gwin in reclaiming the silver, nor was there a time for repayment discussed or agreed upon.

To establish that Gwin was in fact a bailee for hire or was acting as a trustee requires more definite proof that the arrangement was not a sale by IHS to Gwin as indicated in the correspondence quoted above. There is no evidence of government control over the film or the funds after delivery to Gwin. *Cf. United States v. Perez,* 707 F.2d 359 (8th Cir.1983) (theft of government exhibit during trial: sufficient possession and control to be property of the United States); *United States v. O'Kelley,* 701 F.2d 758, 760 (8th Cir.) (theft of Treasury check: government property because stolen "before the process of orderly negotiation * * * ever began."), *cert. denied,* 464 U.S. 838, 104 S.Ct. 128, 78 L.Ed.2d 124 (1983). Gwin never worked for IHS, either as an employee or agent. The government never notified Gwin or any third party that Gwin was its agent. At trial there was little evidence presented showing any indicia of agency or bailment.[4]

---

4. In fact, during testimony by Curtis Smith, the radiology programmer for the IHS whom Gwin originally contacted, the trial court questioned Smith concerning the agreement with Gwin:

   Q. [By the court] And basically he was to purchase the x-ray film from—
   A. [By Smith] Yes.
   Q. —by picking it up and delivering it to a processor for processing?
   A. Yes.
   Q. And he was to process it himself also?
   A. I understand that he would do the processing himself, yes, sir.
   Q. And it says in his letter to you that he was to purchase all available used x-ray film in your area.
   What were the terms of purchase?

The government argues that *Perez* and *O'Kelley* support its contention that the monies were property of the United States. However, neither case aids the government; in each instance the government had a much greater control over the funds. *See United States v. Wheadon*, 794 F.2d 1277, 1283–84 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1307, 94 L.Ed.2d 161 (1987).

Gwin was not to pay the money for the X-ray film to the government but to a private third party, Picker. At best receipt of these funds by Picker would have established only that a debtor had paid to a third party a debt owed by him to the government. These funds would not be government funds or monies.

The Supreme Court has long ago decided the question of what constituted government monies for conviction of embezzlement. In *United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910) the Court reviewed the dismissal of charges against a federal district court clerk for embezzling government funds. At the time, the clerks were permitted to keep "fees and emoluments" up to a certain amount. Twice each year an accounting was made and any surplus paid over to the Treasury. The Court held that such funds were not government property:

> The clerk of a court of the United States collects his taxable 'compensation,' not as the revenue of the United States, but as the fees and emoluments of his office, with an obligation on his part to account to the United States for all he gets over a certain sum which is fixed by law.

*Id.* at 530, 31 S.Ct. at 33. That case presented a much closer question than does the case presently before us.

Similarly, the Supreme Court has considered the question of whether taxes owed the government are property of the United States. *United States v. Johnston*, 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925). Johnston collected fees for a boxing match,

including taxes placed on such fees. However, Johnston never paid the federal taxes to the government. Johnston was charged with embezzling government monies. There the Court said:

> [I]t seems to us that under this law the person required to pay over the tax is a debtor and not a bailee. The money paid for the tax is not identified at the outset but is paid with the price of the ticket that belongs to the owner of the show.

*Id.* at 226–27, 45 S.Ct. at 496. In the instant case, Gwin turned film over to Tri-State for silver reclamation and received compensation in return. There was uncontested testimony that on each occasion the film contained some film collected from private sources. We can see no distinction between this case and *Johnston*.

Here, IHS did not attempt to notify the processor to put IHS's name on any checks given to Gwin. In fact the government testimony reflects that its agents thought Gwin would be the processor and sell the silver himself to make a profit. This demonstrates that monies received by Gwin would be considered to be his proceeds.

The indictment makes clear that the defendant was charged with embezzlement of monies of the government. He was not indicted for conversion of the film. We think the government's evidence is undisputed that Gwin purchased the film; as such the monies received were paid to him and the nonpayment of the purchase price did not demonstrate more than a default of a debt owed to the government. The judgment of conviction of the district court is hereby reversed and the charges ordered dismissed for lack of sufficient evidence.

Judgment reversed.

How much was he to pay you and how he was to pay you?
A. That was determined by the market value of silver on the day of refinement. That was included in his letter of intent and in my

memo to the hospitals and clinics. Because of the market fluctuating from day to day, that's how we would determine the value. Transcript at 75–76.