851 F.Supp. 1296 (1994)
UNITED STATES of America, Plaintiff,
v.
Glen REED, Defendant.
Crim. No. 93-50048-02.
United States District Court, W.D. Arkansas, Fayetteville Division.
April 12, 1994.
*1297 R. David Lewis, Little Rock, AR, for plaintiff.
P.K. Holmes, U.S. Atty., Claude Hawkins, Asst. U.S. Atty., Fort Smith, AR, for defendant.

MEMORANDUM OPINION
H. FRANKLIN WATERS, Chief Judge.
This criminal case arose when a federal grand jury indicted Ezra Earl Maglothin, Jr., licensed as an attorney by the State of Arkansas, practicing in Fayetteville, Arkansas, and Glen Reed, an accountant and formerly a certified public accountant. Mr. Reed was Mr. Maglothin's accountant working out of his law office at the time of the occurrences described below. It was alleged in the indictment that from on or about July 1, 1991, to on or about August 13, 1993, the defendants, aiding and abetting each other, "devised and intended to devise a scheme and artifice for obtaining money by means of false and fraudulent pretenses, representations, and promises."
It was alleged that, as part of such scheme and artifice to defraud, Mr. Maglothin would offer his services as an attorney to the general public, and Mr. Reed would offer his services as an accountant. It is charged that, during their representation of their clients, they would, by various false and fraudulent pretenses, representations, and promises, induce such clients to allow money belonging to them to be placed in the attorney trust account maintained by Mr. Maglothin. The indictment then alleges that the defendant, through various means, withdrew such funds from the trust account, and converted them to their own use.
Based on these alleged activities by the defendants, each was charged with multiple counts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, and one count each of stealing, embezzling, and converting to their own use money which was being held in the trust account for the benefit of the United States in violation of 18 U.S.C. § 641 and 18 U.S.C. § 2. Additionally, Mr. Maglothin was charged with one count of wire fraud and two counts of money laundering in violation of applicable federal law.
The court granted Mr. Maglothin's motion to sever and provided in the severance order that the Maglothin case would be tried beginning the week of February 28, 1994, with the Reed case to immediately follow, with totally different jury panels being utilized for each of the trials.
The Maglothin case was tried to a jury commencing on February 28, 1994, and ending when the jury acquitted him of all counts on March 2, 1994. The Reed case was commenced on March 3, 1994, and ended when the jury convicted him on the charges contained in three counts of mail fraud and one count of stealing and embezzling government money or property. Now pending before the count is Mr. Reed's motion for judgment of acquittal presumably filed pursuant to the provisions of Rule 29 of the Federal Rules of Criminal Procedure.

The Victims
The crimes (and the court believes they were crimes) about which this court heard an abundance of evidence during these two trials were, by no means, victimless crimes. There were numerous victims, certainly including several who testified whose woeful and heartrending stories will be told below. Additionally, society in general was a victim, as well as two professions, law and accounting, which, in the past at least, have been respected, productive, important, and useful parts of our society.
While, in the last 12 years of doing this job as United States District Judge for this district, this judge has heard cases that evoked personal feelings and concern about various aspects of our society, none have literally *1298 made me "sick at my stomach" as this case did.
As the evidence unfolded of the reprehensible conduct of the defendants in this case, the court actually began to understand why, during the court's voir dire of the jury, six jurors stood and had the "guts" to tell the judge, whom they knew is also a lawyer, that they could not give the defendant lawyer a fair trial simply because he was a lawyer, implying in some cases, and saying in effect in others, that they had a feeling which they could not wipe from their minds that all lawyers are "crooks."
While this court is convinced that those jurors were "wrong" to lump all lawyers together because of the highly publicized conduct of a very small percentage of "bad apples," the court recognizes that it would be difficult to convince the average layperson that people such as Mr. Maglothin and over a half dozen other lawyers from this area of relatively the same legal generation who have either admitted, been convicted of, or disciplined for dishonest conduct ranging from orchestrating and operating a gigantic insurance fraud scheme to attorney-elected officials taking bribes to "fix" criminal charges made against citizens, were an exception and not the rule.
Certainly the evidence which fourteen jurors heard in this case, and faithfully reproduced and reported by the news media, will only serve to do even more damage to an already wounded profession.[1] Conduct such as that disclosed during the trial of this case make it increasingly difficult to convince anyone that only a very small, almost minute percentage of lawyers and accountants, are dishonest and engage in deceitful conduct against the best interest of their clients. The conduct of honest professionals is not newsworthy, so the public doesn't hear about them. Thus, the court is convinced that society, the legal profession, and the accounting profession are truly victims in this case.
While society and those professions were undoubtedly harmed by the conduct of the defendants in this case, that harm was somewhat undefinable and difficult to quantify. That is not true of the harm that was done to individual victims in this case, and the court will now summarize conduct which resulted in damages to those individuals that are clear and unmistakable and subject to being quantified.
The court will first explain the method by which money belonging to clients described below should have been handled and is handled by most lawyers. Howard Brill, a University of Arkansas professor and an acknowledged expert on legal ethics, testified and described the obligation imposed upon lawyers when dealing with funds belonging to others. Professor Brill explained that most lawyers have office accounts into which money belonging to the lawyer or law firm are placed and from which various expenses are paid. Additionally, however, every lawyer is required to maintain a trust account which is used to deposit the funds belonging to others coming into the hands of the attorney.
Except for a small amount which is sometimes placed in the account by the lawyers when it is first opened, all other funds in that account belong to others and the attorney is expected to properly maintain and account for such funds. The attorney is not permitted to commingle his funds with that of his clients, and if he does so, he has committed an unethical act which could result in discipline. He may not use those funds for his own purposes under any circumstances, and must always have them available to remit to his client at the appropriate time.
An attorney may not, under the ethical rules, even temporarily use his clients funds for any purposes and may not even invest them for his client except where very specific rules are followed. Any investment of a client's funds must, of course, be with the client's permission and must be fair to *1299 the client. The lawyer cannot ethically recommend that the funds be invested in speculative ventures, and any investment made for the client, after consent, must be disclosed in writing and the client must be told before the investments are made that he should get independent advice from other counsel.
If these rules are not followed, it is unethical for a lawyer to invest his clients funds or to go into business with the client under any circumstances. Again, if the attorney violates these ethical rules, he is subject to discipline which can include disbarment.

Barbara K. Walden
Witness Barbara Walden, from Russellville, was a pitiful example of how a person who has the misfortune of hiring a lawyer who disregards ethical rules and who engages in a course of deceitful and dishonest conduct is irreparably affected. Ms. Walden, obviously an uneducated person, was either in tears or near tears during her entire testimony. While on the witness stand she told a tale which should have made any honest, responsible person "sick at their stomach" as it did this judge.
Ms. Walden was an over the road truck driver, and in April of 1990 she was asleep in the sleeping compartment of an over the road tractor when the tractor started burning. She jumped from the vehicle and broke her neck and "messed up" her shoulder. She had surgery and still is required to see a physician approximately once per month. She can't raise her right arm and has been given a disability rating of 25% to the body as a whole.
She knew Mr. Maglothin because he had at one time been engaged, according to her, in the trucking business. She journeyed to his office on the south side of the square in Fayetteville and retained him to represent her on a contingency fee arrangement. A fee agreement was entered into in which Mr. Maglothin was to receive 40% of the net of any amount recovered.
A lawsuit was filed against Freightliner and it was subsequently settled for $300,000. She understood that she was to receive, after expenses and attorney's fees were paid, approximately $118,000. The $300,000 check or draft was sent to Mr. Maglothin, and he deposited it in his trust account. The settlement was just before Christmas of 1992, so on December 22, 1992, he gave her $2,000 to "get me through Christmas." He told her that the settlement check had not cleared. On January 15, 1993, she called him and asked for her money but was told that the settlement check or draft had not yet cleared, but he wired her $5,000.
On January 29, 1993, when she had still not received her portion of the settlement, she again called Mr. Maglothin and asked for some of her money. Mr. Maglothin again wire transferred to her bank $5,000. Ms. Walden believes but was not certain, that it was at this point that she was told by Mr. Maglothin that "the IRS looks at anything you do over a certain amount and $5,000 would be O.K."
When February 22, 1993, came, approximately two months after the settlement had been received, Ms. Walden still had not received any money other than that she had literally pried from Mr. Maglothin's grasp. At that time she began to attempt to obtain some or all of her funds. According to her testimony, she called him many times and, in most cases at least, Mr. Maglothin neglected or refused to return her calls. Through tears which caused the court to take a short recess, she advised that "$5,000 was a lot of money" to her. After trying numerous times, she finally got in touch with Mr. Maglothin, and he sent her another $5,000 by wire transfer.
On May 15, 1993, again after several attempts, Ms. Walden contacted Mr. Maglothin and he told her that a check was in the mail. Ms. Walden, apparently becoming wiser, told him "don't mail it, I'll come get it." She was told that Mr. Maglothin's wife had already mailed the check. She waited for the check to arrive in Russellville for several days and it, of course, did not arrive. She then journeyed to Fayetteville and literally "camped out" in Mr. Maglothin's office in an attempt to see him.
She finally found him at a club that he operated around 9:00 p.m. that evening. However, rather than giving her the money that belonged to her, he invited her and her boyfriend who was with her to go fishing with him on Beaver lake in his boat.
*1300 He told her that they would get her check the next day. They stayed on the boat during the night and most of the next day, and arrived back in Fayetteville just before the banks closed. He then told her that her funds were invested, that they were safe, and that she should not worry. He gave her a promissory note dated May 19, 1993, due and payable in full on June 4, 1993, in the face amount of $74,942.00. He told her that he would give her, in addition to the face amount owed, 10% of that amount on June 4 and gave her a paper containing a side agreement saying that. She testified at the trial that she was satisfied with that because she believed that she was going to get, on June 4, not only all of her money but another $7,494.00.
She believes that it was at that time that he also gave her a settlement sheet which purported to show the distribution to be made of the settlement proceeds. The settlement sheet showed costs and expenses totalling $8,517.41, but she testified that she had not authorized all of those. Included in the expenses was an amount of $500 paid to Glen Reed as an "expert" fee.
Additionally, there was a $1,500 check to the Molinsky Law Firm for assisting in the workers' compensation claim in Oklahoma resulting from the accident, but Ms. Walden testified that she didn't even know Molinsky, and that he had not represented her. Instead, an attorney named Kouri was the lawyer retained by Mr. Maglothin for that purpose and he testified at the trial that he had never received compensation for the services that he rendered.
Of course, the promissory note was not paid and the payments to Ms. Walden at this point totally ceased. By the end of June she began to make frequent trips to his office and, according to her testimony, she would often sit in his office two or three days trying to catch him. She says from the end of June to the first of August, she came to Fayetteville almost every week and in most cases waited hour upon hour but he was either "not in" or "too busy" to see her. These persistent efforts apparently resulted in Mr. Maglothin finally giving her another $4,000 on June 24, 1993.
Toward the latter part of June, 1993, Ms. Walden found an over the road tractor that she wanted to buy because she thought the purchase price was reasonable and, since it could be driven by her boyfriend, it would give her some income which she badly needed in view of her inability to work because of the accident. She attempted to get money from Mr. Maglothin to be used for that purpose and she learned for the first time that he claimed to have invested her funds in antique miniature Russian flintlock guns and diamonds, investments that must have set her mind at ease.
In fact, in June, Mr. Maglothin came by her home in Russellville and told her that he was on his way to Dallas to sell the guns and diamonds and that he could "turn them right now." He told her that she could have her money immediately when he returned. Of course, he did not "turn" the guns in Dallas and, according to his testimony at the trial, he still owns them, but admitted that he had declined to tell the grand jury where they were.
When Ms. Walden continued to press Mr. Maglothin for information as to the location of her money she learned of a new investment that he claimed that he made  FDIC and RTC mortgages which he intended to sell in the "secondary market." She testified that she "never did understand what they were" but that he showed her something out of a newspaper. When she would ask him for evidence that her funds were so invested, he would change the subject or tell her that he didn't know where the papers were. She then pitifully testified: "I didn't know how to ask about FDIC stuff. I don't know anything about it anyway."
Toward the last of July or in early August Ms. Walden needed money to pay on the truck that she had purchased. After numerous attempts, she finally found Mr. Maglothin at the home of Ray Montez (operator of a Fayetteville restaurant and friend of Maglothin), and was given a check for $4,000 but was told that she should hold it for a few days because there were not sufficient funds in the account on which it was written to cover it. She waited several days and it was *1301 "hot." She tried several times after that to negotiate the check but it was still "hot."
Since she could not receive the money that belonged to her to pay on the truck that she had purchased, she decided to attempt to borrow money to use for that purpose from the Bank of Russellville. In order to aid her in obtaining the loan, Mr. Maglothin, in early August, wrote a letter to the bank president advising him that she had funds that were due her which were "invested through my office in various ventures, such as purchasing FDIC and RTC commercial paper and selling the paper on the secondary market, purchasing and reselling a set of miniature flintlock guns and brokering diamonds." The bank president was told in that letter that Ms. Walden had a "substantial profit" and that she would be receiving her money in a few days.
After that time she received $1,000 paid to her by Ray Montez, who testified that he gave it to her at Mr. Maglothin's request because he was a friend. That was the last of the funds paid to Ms. Walden, although Mr. Maglothin did give her a watch to "shut me up and make me go home" which she subsequently sold for $2,000. She believes that she was still owed $62,140 without considering any interest.
She plaintively testified that he had told her that she could not get her money out of the bank because of "money laundering, but it was mine. I didn't do anything wrong." At the time of the trial she had received no further amount, and the trust account had been closed.

Tommy Henderson
Mr. Henderson, residing in Prairie Grove, was employed at the time of the trial at the freezer of Tyson Foods as a lift truck driver. He testified that he quit school in the tenth grade and that his only other work experience was on miscellaneous construction jobs and in the raising of chickens. He was married with three children, ranging in age from six to ten.
In early 1993 he suffered a broken leg and injuries to the pelvis in an automobile accident in which he was hit, head on, by an automobile operated by a drunk driver. He retained Mr. Maglothin as his attorney by consulting his advertisement in the yellow pages, and agreed to pay him one-third of any net amount received by him. The case was settled for slightly over $53,000 and that amount was received in two drafts or checks, one in the amount of $48,000 and the other, payable to Washington Regional Medical Center, the hospital that had provided medical care to him, in the amount of $5,000. The $48,000 amount was placed in Mr. Maglothin's trust account and, after other expenses were paid including Mr. Maglothin's one-third contingency fee, Mr. Henderson was to receive $27,559. Other expenses owed by Mr. Henderson were to be paid by Mr. Maglothin out of funds to be held in the trust account.
On May 24, 1993, he received a check representing the amount due him, and he took it to a bank to negotiate it. The bank would not give him the funds until the check or draft had cleared and advised him that it would take about a week to accomplish that. He testified: "Our utilities were being shut off so we couldn't afford to wait a week. I got three kids you know, and can't afford it."
He then took the check to another Fayetteville bank and attempted to open an account there but was told that that bank would not open an account because an inquiry in respect to his other banking dealings indicated that he owed another bank $50.00 from 1988 or 1989.
He then returned to Mr. Maglothin's office and had a discussion with him and Glen Reed about what could be done to allow him to receive money that he needed immediately. Mr. Maglothin proposed that the proceeds of the check be deposited in his trust account and that Mr. Henderson could "get it any time I needed it or wanted it."
Glen Reed proceeded to accompany Mr. Henderson to a local bank and a cashier's check was obtained for the check which had been given Mr. Henderson. Mr. Henderson received a check in the amount of $6,500 and the remainder was deposited in the trust account. Mr. Henderson testified that he had, since that time, received $1,000 two or three times from Mr. Maglothin and that he believed that he had received about $4,000 in addition to the amount received when the *1302 proceeds of the cashier's check was deposited in the trust account.
Like Ms. Walden, he then had difficulty contacting Mr. Maglothin. He called numerous times, and his calls frequently were not returned. His wife and children would go to Mr. Maglothin's office and sit all day attempting to contact him so that they could receive money from him. He said that not only could he not receive his money, he subsequently learned that not all of the bills for expenses which Mr. Maglothin was to pay had been, in fact, paid. He testified that he was still receiving statements for debts owed which should have been paid from the trust account.
According to his testimony, because he believed that he had been told that he could receive the amount due him at any time, he bought a 1985 Chevrolet pickup truck and wrote a check for it but the check "bounced." He then learned that the "hot check" was in the prosecutor's office and that the prosecutor was threatening to prosecute his wife because she had written the check. Because he "didn't want to get her in trouble" he asked Mr. Maglothin for funds to cover the check, but none were forthcoming. He ended up returning the pickup to the dealer from which it was purchased, and was then allowed to retrieve the check, and his wife was not prosecuted. This transaction resulted in his losing the vehicle he had traded when the purchase was made.
His wife was subsequently arrested for other insufficient funds checks that she wrote which were not covered by Mr. Maglothin as they claimed to have believed was the arrangement, and it was necessary to pay funds to a bondsman to obtain her release from jail.

Marilyn Steele
Marilyn Steele is a young lady who has apparently somewhat sporadically been a student over the last several years at the University of Arkansas in Fayetteville and the University of Central Arkansas in Conway. She has income of approximately $12,000 per year from a small trust fund left to her by her father. In late 1990 she was arrested for possession of a controlled substance, and retained Mr. Maglothin to represent her. She had previously met him through a mutual friend. Her mother, Joyce Sills, who had worked for 14 years as a nurse's aide at St. Scholastica Convent, paid Mr. Maglothin a retainer of $15,000 to represent her daughter.
In January of 1991 Mr. Maglothin arranged a plea agreement with the prosecuting attorney's office. As a result of that plea agreement, it was agreed that Ms. Steele would pay a total of $191.00 in court costs and $10,000 in fines or similar penalties. Additionally, she agreed to spend a specified time in the Washington County Jail, and ultimately was incarcerated for a period of 52 days. Of course, her nurse's aide mother paid the $10,191 which her daughter had agreed to pay.
Shortly after Mr. Maglothin began to represent her, Ms. Steele advised him that she had not paid income taxes for the years 1986 through 1991. Since she was going to jail because of the drug charges, she wanted to get all of her legal difficulties cleared up at the same time. Mr. Maglothin had a conversation with Ms. Sills, and advised her that she should see that Ms. Steele's taxes were paid.
Further discussions resulted in an agreement that Glen Reed would prepare the necessary tax returns and that Ms. Sills, the mother, would deposit sufficient funds in the trust account to cover both federal and state income taxes which were undoubtedly due. Because Ms. Steele had, in the past, been required to pay from $1,500 to $2,000 in total federal and state taxes, it was determined that the sum of $10,000 should be deposited to Mr. Maglothin's trust account from funds provided by Ms. Sills, to be ultimately used to pay any taxes determined to be due.
In January of 1991 Ms. Sills met Mr. Reed at a restaurant in Fayetteville, after speaking with Mr. Maglothin, and was told that the $10,000 should be placed in Mr. Maglothin's trust account because it was better for the taxes to be paid in that manner because if Ms. Sills paid them, she would owe gift taxes. Of course, as the attorney who presently represents Ms. Steele confirmed, and as Mr. Reed acknowledged, if that was said, it was not true.
*1303 Ms. Steele went to jail and served her time, but during that period neither she nor her mother heard from either Mr. Maglothin or Mr. Reed in respect to the returns. She became concerned about it and contacted Glen Reed on more than one occasion and was told that the returns had been prepared and that the amount due had been paid, and since she had heard nothing from the Internal Revenue Service, she shouldn't worry about it.
She also contacted Mr. Maglothin and was told that, if Mr. Reed said the returns had been taken care of, he was sure that they had. She, her mother, and her sister tried numerous times thereafter to obtain copies of the returns and evidence that her taxes had been paid, but were unable to do so.
She said that she and her family members were told by Mr. Reed that they were in the file, or in storage, and on one occasion he told her that he would bring her copies when he came to Conway where she then lived while he was there visiting a pregnant daughter. Of course, no such evidence was ever supplied to her, and it turns out, when she hired another attorney to represent her, that no returns were filed, and the taxes due had not been paid.
Although Ms. Steele believed that Mr. Reed had agreed to prepare the returns without payment of fee to reimburse her for work that she had done for him when she worked for another accountant, she later learned that $1,500 of the amount deposited in the trust account by her mother had been paid by check to Glen Reed, either signed by him or stamped by him with Mr. Maglothin's signature stamp.
In October of 1993 Ms. Steele received a telephone call from Philip Guinn, a certified public accountant for whom she had at one time worked and who had business and personal connections to both Mr. Maglothin and Mr. Reed. He asked her to come to Fayetteville to attempt to settle the amount that was owed her or her mother. She then called Mr. Maglothin, and he also told her that if she would come to Fayetteville he would obtain her money for her.
She met him at the office of Philip Guinn and learned for the first time that she, in order to obtain her money, would be expected to sign an affidavit which was prepared by Philip Guinn in his office using information dictated to him by Mr. Maglothin. She learned that he was attempting to have several of his clients to whom he owed money from his trust account sign similar affidavits clearing him of any wrongdoing or misuse of funds.
When the affidavit was completed, she learned that it would have her swear that Mr. Maglothin had not misused her funds and was not guilty of any wrongdoing. After consulting with her lawyer, she refused to sign the affidavit.[2] The affidavit that Mr. Maglothin and Mr. Guinn attempted to get Ms. Steele to sign was introduced as government's Exhibit # 61.
Of course, the taxes have not been paid, and Ms. Steele still owes them, including penalties and interest, and the $10,000 which her mother deposited in Mr. Maglothin's trust account has disappeared.
Her present attorney, Neal Pendergraft, testified that the returns necessary were exceedingly simple, and they showed that she owed federal and state taxes, not including interest and penalties, of $5,800. He testified that, although Mr. Reed had withdrawn $1,500 from the trust account as payment for returns he did not prepare and file, the normal fee for preparing returns as simple as these would range from $75.00 to $125.00 for each year, for both returns.

Nancy Reed
Nancy Reed, the housemother for the Pi Kappa Alpha Fraternity at the University of Arkansas in Fayetteville became involved in a divorce proceeding with her husband of 18 years. During the divorce she retained Mr. Maglothin to represent her upon the recommendation of a mutual friend. At the time *1304 that she retained him, her financial circumstances were meager to say the least, so she gave him, to be applied to her fee, an antique file cabinet and a spanish antique chest of an estimated value of more than $5,000. She also paid him small amounts of money to go on the fee as she was able to do so.
The divorce proceedings were lengthy and became final in July of 1988. Then, apparently as a result of certain proceedings that ensued after the divorce, her ex-husband, in April of 1992, was ordered to pay her $25,000 in a lump sum payment.
A check in that amount was hand-delivered to Mr. Maglothin and she came to his office and endorsed the check. At that time, she advised Mr. Maglothin that her finances were very short and "would it be possible for me to have a part of that money and he was nice enough at that point in time to let me have $3,000 out of the $25,000." He told her that the remainder had to stay in his trust account because there were more legal proceedings necessary. When asked why she allowed the money to be placed in his trust account, she replied: "Because I trusted him."
Ms. Reed asked Mr. Maglothin many times for her money, and in the summer of 1993 he told her he would give her a check the following Monday. Of course, the money was not received, so she made several subsequent telephone calls and could not get in touch with Mr. Maglothin. Those calls were not returned. She appeared to be embarrassed by the fact that she allowed the money to lie in the account for so long and said that each time she talked with Mr. Maglothin he convinced her that he would take care of the matter. She testified that: "Mr. Maglothin had a wonderful ability to convince me that everything was all right." When asked whether checks that were written on the trust account to Mr. Maglothin in the amount of $3,750 and $1,244, designated as attorney's fees in her case, were written with her permission, she replied, "Absolutely not."
In March of 1993 Mr. Maglothin called Ms. Reed at the Pi Kappa Alpha House and asked her if he could use the money on deposit in a business venture. He told her that he would tell her what the venture was at a later date. She replied that at her age, 65, she didn't want to take any risk because she couldn't recoup any losses. She asked him to let her think about his request, but he told her that he needed to have her answer in the next 30 minutes because he had limited time to make the investment. He then told her that he would personally guarantee the indebtedness and would consider it to be a personal loan. She then hesitantly authorized him to use her money. She said: "Again, I just believed everything Scotty told me." At that time, he told her that she would get her money back in 30 or at the most 60 days and that he would send her papers showing what the investment consisted of. She, of course, received no such papers although she asked for them from a half a dozen to a dozen times.
Incredibly, Ms. Reed testified that she worked for Mr. Maglothin for no salary for a period of from five to six weeks in the summer of 1993 "because he needed help." When asked why she had donated her work to Mr. Maglothin who had taken her money she said: "Because I like him."
Ms. Reed, of course, has not received any portion of the $22,000 belonging to her which she allowed to be placed in Mr. Maglothin's trust account, and at the trial seemed to be reconciled to the fact that it was not likely that she was ever going to.

William H. Cannon
Mr. Cannon had worked as a bookkeeper in the Fayetteville area for over 40 years, and at the time of the trial was employed as a part-time bookkeeper. He also had, for 39 years, spotted for the scoreboard at University of Arkansas Razorback basketball games.
Mr. Cannon owned what had once been a residence on a lot on West Dickson next to Collier's Drugstore in Fayetteville. A person who desired to place a pizza restaurant on the lot offered to purchase it from Mr. Cannon for the sum of $400,000. Apparently because the prospective purchaser had an attorney, Mr. Cannon assumed that he needed one.
He had known Mr. Maglothin for some time, so he contacted him and asked him if he would represent him in the real estate transaction. When he asked Mr. Maglothin what he would charge, the reply was: "No *1305 more than a real estate agent would charge you."
The purchase was consummated and the transaction closed in Little Rock, by a representative of an abstract company there who testified at the trial. The $400,000 purchase price was paid and the closing agent distributed the funds. After all expenses and indebtedness owed on the property were paid, Mr. Cannon had coming approximately $69,000. He authorized the closing agent to wire transfer the funds to Mr. Maglothin's trust account, and that amount was deposited there. Mr. Maglothin took $24,000 out of the amount in the account to pay his attorney's fees for the rather simple real estate transaction in which he appeared to play a minimal role and provided minimal services, gave Mr. Cannon $500 of his money, and over the next several months converted the remainder to his own use.
Mr. Cannon has received no further funds from the money that is due him. When asked why he did not press Mr. Maglothin in an attempt to obtain the money due him, he responded: "I trusted Scotty."

Other Victims
While no one seems to know, including Mr. Maglothin, exactly how many other victims there were who suffered a similar fate at the hands of Mr. Maglothin and his accountant, Mr. Reed, or how much they are owed, there are clearly others. Mr. Maglothin admitted during cross-examination that he knew there were others, but professed not to know who they were are how many of them existed.

Discussion and Ruling

The Applicable Standard
At the close of the evidence the court advised counsel that it was going to allow the jury to consider the case against Mr. Reed, although it had serious doubt that there was sufficient evidence to convict Mr. Reed of a federal crime. In so doing, the court apprised counsel that it had no doubt that there was ample evidence from which reasonable jurors could conclude that there was, as already stated, a lot of lying, cheating, and stealing going on in Mr. Maglothin's office and that there was also an abundance of evidence from which reasonable persons could conclude that Mr. Reed was, by no means, an innocent bystander, and not only converted money to his own use, but aided and abetted Mr. Maglothin in bleeding all of the funds out of the trust account, leaving immediately before it was closed, only $34.27. The court's concern was not whether crimes had been committed by both of the defendants, but whether they were federal crimes.
In Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the United States Supreme Court, in a mail fraud case, pointed out that:
The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.
Id. at 95, 65 S.Ct. at 151.
The Court of Appeals for this circuit in United States v. Pardue, 983 F.2d 843 (8th Cir.1993) instructed trial courts that the applicable standard when considering a motion for judgment of acquittal is whether a reasonable juror could have found guilt beyond a reasonable doubt. Such a motion "should only be granted where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any essential element of the crime charged." Id. at 847 (quoting United States v. Mundt, 846 F.2d 1157, 1158 (8th Cir.1988)).
Utilizing this standard, the trial court has "very limited latitude...." United States v. Jewell, 893 F.2d 193, 194 (8th Cir.1990). The trial court can neither weigh the evidence nor assess the credibility of the witnesses. Burks v. United States, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
Applying these standards, the court will discuss in turn defendant's contention that the court should enter a judgment of acquittal on both the mail fraud and theft of government property convictions because there was not sufficient evidence to support them.[3]

*1306 Mail Fraud

While in the case against Mr. Maglothin, other mailings and wire transfers were alleged, in the three mail fraud counts against Mr. Reed resulting in his conviction, the only mailings alleged were that he and Mr. Maglothin "aiding and abetting each other, for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly cause to be placed in an authorized depository for mail matter some or all of the bank statements from the trust account of Ezra Earl Maglothin, Jr., which are listed below...." Thus, the court must determine whether the mailing of routine bank statements on the trust account support the mail fraud charges of which Mr. Reed was convicted.
In United States v. Taylor, 789 F.2d 618, (8th Cir.1986), the court reiterated the applicable law developed in cases of the United States Supreme Court and the Court of Appeals for this circuit as follows:
In order to prove a violation of section 1341, the government must prove beyond a reasonable doubt that the defendant devised an intentionally fraudulent scheme, that the defendant sent or caused to be sent some article through the mails, and that the use of the mails was for the purpose of executing the scheme. United States v. Freitag, 768 F.2d 240, 242-43 (8th Cir.1985); see United States v. Lane, [474] U.S. [438], 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); United States v. Maze, 414 U.S. 395, 399-400, 94 S.Ct. 645, 648-49, 38 L.Ed.2d 603 (1974). Crucial to a conviction for mail fraud is a showing the mailings are "incident to an essential part of the scheme," although it is "not necessary that the scheme contemplate the use of the mails as an essential element." Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); see also Maze, 414 U.S. at 399, 94 S.Ct. at 648; United States v. Cooper, 596 F.2d 327, 329 (8th Cir.1979). Thus, as a general proposition, use of the mails after a scheme reaches fruition will not constitute grounds for a conviction. See Maze, 414 U.S. at 402, 94 S.Ct. at 649-50, Kann, 323 U.S. at 94, 65 S.Ct. at 150-51.
Id. at 620.
Defendant's rudimentary one sentence motion and exceptionally brief, 3 page brief were not helpful on the issue of whether there was sufficient evidence to convict Mr. Reed of mail fraud in violation of 18 U.S.C. § 1341. The only portion of the brief which purports to cover that issue are three sentences in paragraph 2 which say:
The mailing was not sufficiently connected to any alleged scheme to defraud. See Schmuck vs. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In that case, the Supreme Court discussed the prior cases on the issue comparing the facts in that case to the previous cases of Kann, Parr and Maze. The facts of our case are closer to Kann, Parr, and Maze, in which cases it was held that the mailings *1307 were not sufficiently connected to the scheme to defraud.
There is no other discussion in either the motion or brief on this point.
Of course, Schmuck, the only case actually cited by Mr. Reed in respect to this issue, does not support his position and, in fact, goes the other way. Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The scheme in that case was perpetrated by a used car distributor who bought, over a substantial period of time, used cars and rolled back their odometers. He then resold these automobiles to customers, who, in turn, paid prices reflecting the lower mileage. In order to complete the resale of each automobile, the dealer who purchased it then submitted a title application to the appropriate authorities on behalf of his retail customer. It was alleged that the submission by Schmuck of the title application form supplied the mailing element of each of the alleged mail frauds.
Schmuck, relying on the decisions of the United States Supreme Court in Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) argued that mail fraud could not be predicated on the mailing of the title applications because they were routine and only tangentially related to the fraud.
Mr. Justice Blackmun in delivering the opinion of the court, first distinguished Kann, Parr and Maze. As he pointed out, in Kann the defendants engaged in a fraudulent scheme whereby they set up a dummy corporation through which they diverted profits into their own pockets. In furtherance of that scheme, they caused the corporation to issue two checks payable to them. Those checks were cashed at local banks which subsequently mailed the checks to the drawee banks for collection. Schmuck, 489 U.S. at 713, 109 S.Ct. at 1449.
In holding that the mailing of the cashed checks to the drawee banks could not supply the mailing element of the mail fraud charges, the court noted and held that the fraudulent scheme had reached fruition when the checks were cashed by the local bank and the monies paid to the defendants. It was immaterial to the defendants whether the paying bank or the drawee bank stood the loss. Thus, the court held that the mailings were not incident to an essential part of the scheme as required by Pereira and other cases. Id., citing Kann, 323 U.S. at 94, 65 S.Ct. at 150.
In Parr, a number of defendants were charged with fraudulently obtaining gasoline and other products through the unauthorized use of credit cards issued to them by a school district by which they were employed. It was claimed by the government that the mailing requirement was satisfied when the oil company which issued the credit card mailed invoices to the school district for payment and when the district mailed payment in the form of a check. Again, the court simply held that the fraud had reached fruition when the goods and services were wrongfully obtained, and it was immaterial to the defendants how the oil company went about collecting its payment. Schmuck, 489 U.S. at 713, 109 S.Ct. at 1449, citing, Parr, 363 U.S. at 393, 80 S.Ct. at 1184.
In a subsequent case, Maze, the defendant stole his roommate's credit card and "headed south on a winter jaunt, and obtained food and lodging at motels along the route by placing the charges on the stolen card." Schmuck, 489 U.S. at 714, 109 S.Ct. at 1449. However, once again, the court found that the scheme had reached fruition when the defendant checked out of each motel because he had then obtained exactly what the scheme contemplated and the mailings merely determined which of his victims would ultimately bear the loss.
Id., citing, Maze, 414 U.S. at 402, 94 S.Ct. at 649.
After distinguishing the cases relied upon by Schmuck, Justice Blackmun pointed out:
Thus, Schmuck's was not a "one-shot" operation in which he sold a single car to an isolated dealer. His was an ongoing fraudulent venture. A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn *1308 required the smooth flow of cars from the dealers to their Wisconsin customers.
Schmuck, 489 U.S. at 711-12, 109 S.Ct. at 1448.
The court believes, in this case, that the conduct of Mr. Reed, aiding and abetting Mr. Maglothin, and the scheme in which they were engaged, is much closer to the facts of the Schmuck case. This was not a "one-shot" deal but, instead, reasonable jurors could conclude, as they apparently did in Mr. Reed's case, that Mr. Reed and Mr. Maglothin, aiding and abetting each other, conceived and perpetrated a long-term embezzlement scheme lasting several years and involving large sums belonging to multiple victims.
Reasonable jurors could further conclude that Mr. Reed's part in that scheme was an essential one. Not only did he aid and abet Mr. Maglothin in carrying out the scheme by doing his bidding in respect to various transactions disclosed by the evidence, he also personally engaged in acts that brought about the embezzlement of funds or aided in it. For example, it was Mr. Reed who actually took Mr. Henderson's cashier's check and had him deposit it in the trust account so it could later be converted to his and Mr. Maglothin's use. It was Mr. Reed who suggested to Ms. Steele that she deposit $10,000 into the trust account to pay tax returns that he promised to prepare, and it was Mr. Reed who, utilizing checks either signed by him or stamped with Mr. Maglothin's signature stamp, converted a substantial portion of such amount to his own use. Similarly, it was Mr. Reed that lied repeatedly to Ms. Steele and members of her family when they attempted to determine whether, in fact, he had prepared the tax returns and paid the taxes as he promised to do, lulling them into a false sense of security. It was Mr. Reed who prepared a clearly fraudulent financial statement for Mr. Maglothin fraudulently showing a net worth in excess of $2,500,000, again conceived for and utilized for the purpose of lulling Mr. Maglothin's and Mr. Reed's clients into a false sense of security by convincing them that they had nothing to worry about in respect to their funds because Mr. Maglothin had a net worth that was more than adequate to cover any amounts owed them.
The bank statements which were mailed to Mr. Maglothin's office were an essential step in the scheme or at least "incident to an essential part of the scheme," Pereira, supra, or "a step in [the] plot" Badders v. United States, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916). The jury could have concluded that they needed the bank statement in order to know how much there was to steal.
The court believes that that statement is supported by the evidence. A summary witness testified that he had collected and studied the bank account records and that, during the scheme, a nominal balance would always remain in the trust account. It was overdrawn on only one occasion and then only for a small amount. The trust account balance would increase when client's funds were, the jury might believe, fraudulently deposited by Mr. Maglothin or Mr. Reed and then be depleted very soon thereafter to a nominal sum by improper withdrawals through the use of checks written by one or both of the defendants. The defendants could not have been able to keep this scheme alive and to withdraw almost the exact amount of the funds available in the account if they had not had the bank statements showing the bank balance.
A reasonable juror could conclude that, if they had not known the bank balance through use of the bank statements, they would have regularly overdrawn the account in a substantial amount and the bank's attention would have been directed to this account, resulting either in an investigation or a closing of the account.
It is significant to note, as Mr. Maglothin admitted during his testimony, that the account was closed after it had been drawn down to a balance of only $34.27. Reasonable jurors might conclude that that was not happenstance but, instead, was part of the scheme and that the bank statements were an essential step in that scheme.
This court believes that its conclusion is supported by other cases in addition to Schmuck, supra. United States v. Pick, 724 F.2d 297 (2d Cir.1983) was a check-kiting scheme where the mailings that supported the mail fraud charge were bank statements. *1309 In affirming the conviction of the defendant, the Court of Appeals for the Second Circuit said:
We believe the mailing of the bank statements satisfies this element. First, it was crucial to the operation of the plan that appellants know the speed at which the victim banks credited deposits and cleared checks. If appellants did not synchronize their actions, a check might be presented before the corresponding fictitious balance appeared on the account, thus exposing the check-kiting schemes.
Id. at 300.
The Court then went on to say:
By contrast here the defendants had to maintain an ever increasing flow of paper that must be mailed between the victim banks if the scheme was to continue in operation. The monthly statements allowed them to fine tune that flow, albeit at some risk, and therefore was clearly in furtherance of the fraudulent scheme.
Id. at 301.
United States v. Waterman, 704 F.2d 1014 (8th Cir.1983) was an arson-fraud scheme in which the defendant, along with many others, purchased homes, insured them, and then burned them for the insurance proceeds. The relevant mailing was when an insurance agent sent a copy of the homeowners insurance policy to the defendant policy owner. The court held that, while the specific use of the mails may not have been essential to the scheme, the acquisition of the insurance coverage on the house was "`incident to an essential part of the scheme'" and then said: "If the owner had not received his copy of the policy, he might not have been aware of the scope of his insurance coverage." Id. at 1019, citing, Pereira, 347 U.S. at 8, 74 S.Ct. at 363.
United States v. Freitag, 768 F.2d 240 (8th Cir.1985) was another check-kiting case from this circuit, and the court, after holding that whether the mailing was an essential part of the scheme was a fact question, affirmed the guilty verdict.
If the receipt of the insurance policy through the mails in Waterman supported a mail fraud conviction because the policy was necessary for the defendant to determine the amount of his insurance coverage on the home that he intended to burn, surely receipt of bank statements by Mr. Maglothin and Mr. Reed, which were necessary so that they could determine how much money there was in Maglothin's trust account for them to steal, would support the guilty verdict of the jury in this case.
Although defendant did not cite it, it might be argued that United States v. Taylor, 789 F.2d 618 (8th Cir.1986) supports his contention that the court should enter a judgment of acquittal. In that case defendant wrote a series of insufficient checks, the first to support a business venture in which he and others were engaged, and subsequently to attempt to cover or cover up the first "hot check." Judge Lay, writing for the panel, likened the situation in that case to the Maze and Kann cases and held that the scheme had reached its fruition when defendant induced the first bank to honor the initial worthless check. The court held that various subsequent mailings in respect to the insufficient check such as notices to various individuals was not an essential step in the scheme.
The court concludes that that case does not support defendant's contention that he is entitled to a judgment of acquittal in this matter. The mailings had nothing to do with Taylor wrongfully obtaining $60,000 from an institution by inducing the first bank to cash a worthless check. The scheme was completed when the funds were wrongfully received, and the mailings had nothing to do with that.
Defendant's motion for judgment of acquittal on the mail fraud charges will be denied.

Theft of Government Property
Section 641 makes it unlawful for any person to steal or knowingly convert to his own use or the use of another "any record, voucher, money, or thing of value of the United States or of any department or agency thereof...." 18 U.S.C. § 641. Both Mr. Maglothin and Mr. Reed were charged in the indictment with violation of this provision, and the alleged theft involved the $10,000 that the mother of Marilyn Steele allowed to be deposited in the Maglothin trust account to pay potential tax liabilities of Ms. Steele.
*1310 Because the court did not believe that the government had made a jury question in relation to this count in the Maglothin case, a motion for judgment of acquittal on that count was granted at the close of the government's case, and the jury was not permitted to consider that count when it deliberated on the fate of Mr. Maglothin. However, because there was additional and different evidence presented in the Reed case, the court allowed that count to be considered by the jury but advised counsel that it still doubted that a jury question had been made, and that it would carefully consider that issue upon proper post-trial motion being made if there was a conviction.
The United States contends that the evidence supports the conviction on this count because the $10,000 which Joyce Sills deposited in the Maglothin trust account, or at least a portion of it, became government funds because it was deposited there to pay taxes owed by Marilyn Steele.
The evidence shows that two checks, introduced as government's Exhibit 96, were written on the trust account, payable to the Internal Revenue Service, one in the amount of $1,832 and the other in the amount of $1,420. These checks were retained in the Maglothin office, and never mailed. The government contends that these checks became government property, and when the funds in the account which should have been used to pay them were converted to the use of the defendant, he violated 18 U.S.C. § 641.
The court believes that the evidence shows that the $10,000 deposit was made on the basis of a very rough estimate of the amount of taxes that Ms. Steele might owe when the proper returns were filed. In making that estimate, Ms. Steele, and, in fact, Mr. Reed had very little to go on. Introduced as Government Exhibit 93 was an IRS reminder of unpaid tax for the year 1986 showing an amount of $1,567.10 and an IRS notice of intent to levy for the same year, showing an amount of $1,587.11 after certain late payment penalties and interest was added, both directed to Ms. Steele.
The United States attorney elicited the following testimony from Ms. Steele in respect to the notices:
Q. Did Mr. Reed use these notices to figure out what your tax liability was?
A. Well, I suppose, you know, it was just a guesstimated since I told him what my usual payments were and it was five years worth of taxes anywhere from $1,500 to $2,000 per year.
In fact, it turned out when Neal Pendergraft, a certified public accountant and attorney who now represents Ms. Steele, testified, that her total tax liability for the years in question, not including penalties and interest, but including state income taxes owed, amounts to only $5,800. The court is convinced that the $10,000 deposited in the trust account had little to do with Ms. Steele's actual tax liability and, in her words, was merely "guestimated."
In United States v. Gwin, 839 F.2d 427 (8th Cir.1988), the Court of Appeals for this circuit considered a conviction under 18 U.S.C. § 641 for embezzling government money. The defendant had agreed to pick up and process or cause to be processed certain x-ray film which had been used at government facilities in South Dakota, extracting silver therefrom. He was to remit the proceeds obtained from the sale of the silver reclaimed to a third-party in behalf of the government agency from which the film was reclaimed to apply on an indebtedness owed or expected to be owed by such government agency to such third party.
The conviction was reversed on appeal, the court holding that, "[t]here is no evidence of government control over the film or the funds after delivery to Gwin." Id. at 429. In so ruling, Judge Lay, writing for the court, pointed out and relied on two older Supreme Court decisions on this issue. In United States v. Mason, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910), the Supreme Court held that a federal district court clerk was not guilty under this statute for embezzling government funds. The clerk, and apparently all clerks at that time, were permitted to collect fees payable to that office and to obtain a portion of his salary from such funds. Twice each year an accounting was to be made and any surplus over and above what he was permitted to retain was paid to the treasury. The clerk did not remit the *1311 excess. The Supreme Court held that the funds that he kept were not funds of the United States but were, instead, a debt that the clerk owed to the United States. He did not hold government property which he stole, but was a debtor. This relationship was not sufficient to sustain his conviction of stealing government property.
In United States v. Johnston, 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925) the defendant was a promoter of boxing matches. He collected fees including taxes in a specified amount placed on such fees. The defendant kept all of the proceeds of the boxing matches, and did not remit the amount due in taxes to the United States treasury. He was charged with embezzling government monies. In holding that he had not violated 18 U.S.C. § 641, the court said:
[I]t seems to us that under this law the person required to pay over the tax is a debtor and not a bailee. The money paid for the tax is not identified at the outset but is paid with the price of the ticket that belongs to the owner of the show.
Id., 268 U.S. at 220, 45 S.Ct. at 496.
Surely if the embezzlement of the funds present in Gwin and in the two Supreme Court cases discussed did not result in a theft of government property, no such theft existed in this case.
As indicated, the $10,000 deposited in the Maglothin trust account by Ms. Sills was, at most, a rough estimate to cover any potential tax liability and, in fact, according to Ms. Steele, the agreement was that any excess would be returned to her or her mother. Certainly, the $10,000 so deposited did not become government property. Similarly, the checks written on the account, payable to the Internal Revenue Service and held either in the checkbook or in files in the Maglothin office, did not become government property because they were never delivered to any agent of the United States. Surely, the mere writing of a check to another does not make the amount specified in that check the property of the person to whom it is payable unless and until it is actually delivered to that person.
To support the conviction, the government relies upon United States v. Klingler, 827 F.Supp. 1287 (E.D.Mich.1993) and United States v. Jackson, 759 F.2d 342 (4th Cir. 1985), cert. denied, 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985). In Klingler, a licensed customs broker failed to deposit and converted to her own use monies owed to the United States as custom duties on goods imported into the United States. Apparently, the procedure was that an importer, using a customs broker, could either remit two checks to the broker, one for the broker's services and the other for the monies owed to the government, or could make both payments in one check payable to the broker. The latter method was used and the broker failed to remit the portion due the government and was charged with violation of 18 U.S.C. § 641. The trial court denied a motion to dismiss the indictment. The Klingler case was apparently not appealed and this court has doubt that it follows the law as expressed in the United States Supreme Court cases discussed above. In any event, the court believes that the facts of that case are distinguishable from those in the instant case. There, at the time of the transaction the exact amount owed to the United States was apparently ascertainable. In other words, there was an amount identified and, in effect, set aside belonging to the United States which the defendant failed to remit to it.
The court does not believe that United States v. Jackson, supra, is even arguably on point. In that case an employee of the United States Forestry Service had the duty of collecting funds remitted to the Forestry Service in payment for timber, maps, and recreation permits sold to the general public. At issue were several checks made payable to the United States for such services and things, and the defendant converted the funds represented by those checks to her own use.
The argument that apparently was made was that, since § 641 covers only "any record, voucher, money, or thing of value," checks were not covered because not identified in the statute. All that the Court of Appeals for the Fourth Circuit held was that checks were "money" as used in the statute. Clearly, once it was determined that checks were money, it was a simple matter to conclude *1312 that the defendant had converted money belonging to the United States to her own use in clear violation of § 641.
The checks which were issued in this case were not made by a third party, payable to the United States for goods or services purchased from the United States. Instead, as already indicated, they were simply checks written but never delivered, intended to pay an obligation of Mr. Reed's client. Until they were delivered, they were nothing more than pieces of paper held in the file, and did not represent money belonging to the United States.
The motion for judgment of acquittal of the charges contained in Count 4 of the indictment against Mr. Reed will be granted, and the conviction in respect to the charges on this count is hereby set aside. The court will, by separate order, enter a judgment of acquittal on those charges.

ORDER
On this 12th day of April, 1994, upon consideration of the motion for judgment of acquittal filed herein in behalf of the defendant, the court finds that said motion should be and it hereby is denied in respect to the charges contained in Counts 1 through 3 of the indictment (the mail fraud counts) but is hereby granted in respect to Count 4 (the theft of government property count). The conviction in respect to such count is hereby set aside, and the court hereby enters a judgment of acquittal in respect to it.
IT IS SO ORDERED.
NOTES
[1] Is there any wonder why polls often show that lawyers rank somewhere below used car salesman in respect to public confidence? Many of us even hawk our wares like they do in tasteless television, newspaper, billboard, and yellow page advertisement, often, if not usually, promising more than we can deliver. The court has observed that the lawyers who use the largest, gaudiest and most tawdry advertisements promising the most, are usually the least capable of producing what they promise.
[2] Her attorney, Neal Pendergraft, testified that Mr. Maglothin knew at the time, from previous contacts that he had had with him, that he represented Ms. Steele, and he said that he advised Mr. Maglothin that he resented his contacting Mr. Pendergraft's client when he well knew that she was being represented by him. Such contact by an attorney of another attorney's client is clearly unethical conduct.
[3] The court has also attempted to consider the other points raised in the scant brief filed by defendant. For example, he argued that his motion "should be granted because the statements of Scotty Maglothin were not that of a co-conspirator as the government alleged and argued, as Scotty Maglothin was acquitted of all crimes, and the government is therefore collaterally estopped because the evidence in that case was virtually identical to the evidence in the Reed case." Brief, para. 3.

If by this hazy language he is arguing that he should be acquitted because of what has come to be known as the "rule of consistency," that contention is meritless because the defendants were tried separately. Cortis v. Kenney, 995 F.2d 838 (8th Cir.1993).
Another possibility is that he contends that the court erred in allowing the statements of his co-conspirator, Mr. Maglothin, into evidence under the provision of Rule 801(d)(2)(E) of the Federal Rules of Evidence because he was acquitted. If that is the case, that argument is also meritless. United States v. Williams, 989 F.2d 1061 (9th Cir.1993) and United States v. Todd, 920 F.2d 399 (6th Cir.1990). The statements admitted were clearly made in the course of and in furtherance of the conspiracy, and were, thus, admissible. Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).
As to the contention that defendant did not timely receive grand jury transcripts and witness lists, see United States v. White, 750 F.2d 726 (8th Cir.1984) in respect to Jencks act material and Arcoren v. United States, 929 F.2d 1235 (8th Cir.1991) cert denied, ___ U.S. ___, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991) as to disclosure of witness lists.
As to the contention that one of the U.S. attorneys engaged in conduct during closing arguments that were unethical as contended in both the brief and during the trial, the court believes that argument to be nothing short of utter nonsense.