UNITED STATES of America,
Plaintiff-Appellee,

v.

Albert PICK and Jordan Mittler,
Defendants-Appellants.

Nos. 215, 219, Dockets 83–1118, 83–1119.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1983.

Decided Dec. 12, 1983.

Sidney Meyers, New York City, for defendant-appellant Mittler.

Sylvia Peck, New York City (The Legal Aid Society, New York City), for defendant-appellant Pick.

William B. Pollard, III, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., Roanne L. Mann, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Before MANSFIELD, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Albert Pick and Jordan Mittler appeal from judgments of conviction on charges arising out of two separate check-kiting schemes.[1] Appellants were convicted by a jury on two counts of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, two substantive counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of entering a federally insured bank with the intent to commit a felony in that bank in violation of 18 U.S.C. § 2113(a). We affirm.

The evidence, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), showed the following. In 1977 Mittler maintained a personal checking account at a branch of the Chemical Bank in Manhattan in addition to a small business checking account. Pick had a checking account in the Hialeah Springs-Miami First State Bank. In January appellants began kiting checks between their respective accounts. Over the next five months Mittler wrote hundreds of checks on his personal Chemical Bank account to Pick,

---

1. Check-kiting "occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the 'kiting' equilibrium." *United States v. Giordano,* 489 F.2d 327, 329 (2d Cir.1973).

who then deposited these checks in one of his accounts at Hialeah Bank and wrote checks payable to Mittler in corresponding amounts.

Chemical Bank branch operations officer Edward Miller learned of this activity shortly after it began. Mittler had cultivated a business relationship with Miller, sweetened by gratuitous offerings including cash and tickets to sports events and concerts. In the course of this relationship, Mittler had described plans to increase his own business banking at Chemical Bank and to bring in other business accounts to the branch. Miller, eager for the new business, had initially authorized checks that Mittler drew against uncollected funds.[2] Miller notified Mittler that the practice could not continue, however, and Mittler promised that no more checks would be presented against uncollected deposits. Nevertheless, the practice continued, with the number of checks and deposits increasing steadily. Although he frequently complained to Mittler about it, Miller nevertheless continued authorizing payment on the presented checks. Finally, in April, 1977, Miller notified Mittler that his account would be closed unless he stopped writing checks against uncollected deposits.

Meanwhile, officers at the Hialeah Bank had become suspicious. On April 18, 1977, operations officer William David examined the transactions on Pick's account at the Hialeah Bank. He noted that most checks drawn by Pick were payable to Mittler and that Pick was depositing checks from Mittler in matching amounts into his account. The Hialeah Bank decided not to pay the most recent checks drawn by Pick and over the next ten days returned numerous checks made payable to Mittler which Chemical Bank had presented for payment. When Pick was notified by David that his checks were not being paid, Pick covered the Hialeah Bank against any loss with two corporate notes, each for $6,280. Pick closed his account at the Hialeah Bank on May 3, 1977.

At Mittler's urging, Miller several times re-presented the returned checks to the Hialeah Bank, which continued to refuse to pay. Finally, on May 12 or 13, 1977, Miller told Mittler that $62,000 worth of checks had been returned to Chemical Bank, an amount in excess of Miller's lending authority. Both Pick and Mittler offered partial payments if Miller agreed to delay reporting the loss to his superiors at Chemical Bank. No payments were forthcoming. Upon learning of the losses, Chemical Bank fired Miller.

In 1980 Pick and Mittler resumed their check-kiting activities, utilizing Pick's account at Chase Manhattan Bank under the trade name Colour-Color, and Mittler's corporate account at Bankers Trust Company in the name of his firm, Dabie Paper Company Inc.

In July, 1980 Pick asked Eugene Schirmer, a branch manager for Chase, to authorize him to deposit as cash into the Colour-Color account checks obtained by Pick from various business firms. Chase collected on these checks without incident, and Pick developed a pattern of depositing as cash checks which Schirmer regularly authorized.

In October, 1980, Pick began depositing as cash checks drawn by Mittler on the Dabie account at Bankers Trust. Over the next six months these cash deposits in Pick's Colour-Color account increased in frequency and dollar amount, while legitimate check deposits decreased. The check-kiting activity reached its peak in the six week period from May 1 to June 15, 1981, when $1.8 million passed through appellants' accounts.

Schirmer had regularly warned Pick that the cash deposit practice would have to stop. Pick claimed a business need for cash, and, beginning in January, 1981, both Pick and Mittler sought to overcome Schirmer's resistance by giving him twenty and fifty dollar bills when Dabie checks were deposit-

---

**2.** Banks do not routinely allow payment of checks drawn against uncollected deposits. Certain bank officers may authorize payment against uncollected deposits as a method of extending credit to preferred customers. In effect, the bank thereby gives an interest-free loan and bears the risk that the covering deposits will not be collected.

ed as cash. Schirmer continued to allow Pick to deposit checks as cash.

Meanwhile, Gloria Schrumpf, the Bankers Trust officer responsible for Mittler's account, warned Mittler several times about drawing checks against uncollected deposits. In April, 1981, she told him that Bankers Trust would no longer tolerate the practice. However, Schrumpf left on medical leave at the end of April and did not return until mid-June.

When Schrumpf returned, she learned that Mittler's account showed deposits and checks drawn in identical amounts over a three-day period. Schrumpf notified Mittler that Bankers Trust would no longer accept checks from Colour-Color and returned to Chase $70,000 worth of Dabie checks payable to Colour-Color which had been deposited as cash in the Chase account. At Schrumpf's request, Mittler deposited $125,000 into his account. Bankers Trust returned all checks drawn by Mittler, including an additional $70,000 worth of Dabie checks to Chase and placed his funds in a suspense account. After Mittler's deposits had cleared, Bankers Trust closed his account and gave him a check for the balance. Bankers Trust did not sustain any loss.

When Schirmer learned on June 17, 1981 that Bankers Trust was returning Dabie checks to Chase, he asked Pick to cover the overdraft and refused to accept further Dabie checks that Pick wanted to deposit as cash to rectify the overdraft. Schirmer was relieved of his position on June 17, 1981 and was fired by Chase shortly thereafter. On July 6, 1982 Mittler gave Chase a certified check for $141,497.79 to cover the losses on Pick's Colour-Color account.

## I

Pick and Mittler contend with respect to their mail fraud convictions that there was no proof that they mailed or caused a mailing "for the purpose of executing" a fraudulent scheme, as required by 18 U.S.C. § 1341.[3] The government argues that the mailing of monthly account statements by the banks satisfies this element. Appellants counter that the bank statements did not further the scheme but endangered it, since the banks might have noticed from the statements the pattern of deposits and withdrawals in identical amounts on the same day, as well as the high level of checking activity on each account.

We believe the mailing of the bank statements satisfied this element. First, it was crucial to the operation of the plan that appellants know the speed at which the victim banks credited deposits and cleared checks. If appellants did not synchronize their actions, a check might be presented before the corresponding fictitious balance appeared on the account, thus exposing the check-kiting schemes. Second, appellants, like any holder of a checking account, needed periodic reviews of their accounts to check for errors. If anything, their need was considerably more urgent as a consequence of their check-kiting schemes. While the monthly statements might also have disclosed the fraud if examined closely, other methods of acquiring account information, such as personal contact or phone calls, entailed an even greater risk of disclosure of the schemes.

*United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is not to the contrary. In that case, the Supreme Court held that mailing of credit card invoices by motels to issuing banks did not further the fraudulent scheme, which had come to fruition prior to the mailings, i.e. when the defendant used the stolen credit card to pay his motel bills. Thus, the fraudulent scheme in *Maze* was over before

---

**3.** 18 U.S.C. § 1341 reads in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do ... knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any [matter or thing whatever to be sent or delivered by the Postal Service] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

any mailings were made. By contrast here the defendants had to maintain an ever increasing flow of paper that must be mailed between the victim banks if the scheme was to continue in operation. The monthly statements allowed them to fine-tune that flow, albeit at some risk, and therefore were clearly in furtherance of the fraudulent scheme.

## II

As a consequence of their entering a Chase branch to give Schirmer cash, appellants were convicted of violating 18 U.S.C. § 2113(a), the second paragraph of which provides that "[w]hoever enters or attempts to enter any [federally insured] bank ... with intent to commit in such bank, ... any felony affecting such bank ... or any larceny" is guilty of a violation. Mittler contends that violations of 18 U.S.C. § 1341, the mail fraud statute, are not predicate offenses under Section 2113(a) and that the second paragraph of that provision applies only to entries with the intent to rob or burglarize. Noting that Section 2113(b) embraces fraudulent takings [4] unaccompanied by force or violence, *Bell v. United States,* — U.S. —, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), Mittler also contends that it violates due process to construe subsection (a) to reach behavior covered by subsection (b), since that construction allows the government to choose between an indictment for a crime punishable by ten years imprisonment or one punishable by twenty years.

■ We begin with the statutory language. Section 2113(a) prohibits entry of a bank with the intent to commit *"any"* felony and in no way limits its application to robberies, burglaries or felonies not covered under other sections of the Act. Nor does the legislative history suggest any such limitation. When first enacted in 1934, the Federal Bank Robbery Act covered only forcible robberies or common law larcenies. In 1937, however, Congress added amendments containing the language codified in subsections (a) and (b) in order to protect

federally insured bank reserves from criminal acts generally. *See Bell v. United States, supra* at 2402; *United States v. Hinton,* 703 F.2d 672, 677 (2d Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 3091, 77 L.Ed.2d 1351 (1983). The inclusion of mail fraud as a predicate offense under Section 2113(a) is consistent with that legislative goal.

■ The fact that the subsections are partially overlapping and allow prosecutors to choose between charges carrying different sentences does not violate due process, since a decision to prosecute under the statute with the heavier penalty "does not empower the Government to predetermine ultimate criminal sanctions." *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979).

We have reviewed appellants' other claims and determined they are without merit.

Affirmed.

---

**4.** Section 2113(b) makes it unlawful to "take[ ] and carry[ ] away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank ...."