UNITED STATES of America,

v.

Webster L. HUBBELL,
et al., Defendants.

No. CRIM. A. 98–0151(JR).

United States District Court,
District of Columbia.

July 1, 1998.

David Barger, Stephen Binhak, Office of the Independent Counsel, Washington, DC, for United States.

John W. Nields, Jr., Laura S. Shures, Howrey & Simon, Washington, DC, for defendants Webster L. Hubbell and Susanna W. Hubbell.

K. Christopher Todd, Wan J. Kim, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for defendant Michael C. Schaufele.

Drake Mann, Gill Law Firm, Little Rock, AK, Shawn Moore, Washington, DC, for defendant Charles Owen.

*MEMORANDUM OPINION*

ROBERTSON, District Judge.

Before this Court are four motions challenging the indictment in this tax evasion case.

One of the motions seeks dismissal of the entire case and will be granted: The charges in the indictment neither relate to nor arise out of the subject of the original grant of jurisdiction to the independent counsel, and the referral order under which the independent counsel is proceeding impermissibly expands that jurisdiction.

A second motion, dispositive only as to defendant Webster L. Hubbell, will also be granted:[1] The independent counsel concedes that he built his case against Mr. Hubbell using 13,120 pages of records that Mr. Hubbell was compelled to produce under subpoena. That use violates the immunity given to Mr. Hubbell by the United States District Court for the Eastern District of Arkansas.

Defendants' third and fourth motions are to dismiss the mail and wire fraud charges and to dismiss a single charge of violation of the "omnibus" provision of the criminal tax code. Those motions will be denied.

## I. MOTION TO DISMISS THE INDICTMENT AS BEYOND THE AUTHORITY OF THE INDEPENDENT COUNSEL

Independent counsels are appointed pursuant to the Ethics in Government Act.[2] Congress carefully limited their authority, as well as that of the Special Division that appoints them.[3] Those very limitations were identified by the Supreme Court as critical to the constitutionality of the Ethics in Government Act. *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). The defendants in this case assert that the Special Division exceeded the statutory and con-

stitutional limits on its authority by referring the subject matter of this case to Independent Counsel Kenneth Starr. They are correct.

This independent counsel was appointed by the Special Division, upon the application of the Attorney General, on August 5, 1994. The appointing order (the "Original Grant") gave him authority to investigate

> [W]hether any individuals or entities have committed a violation of any federal criminal law, . . . relating in any way to James B. McDougal's, President William Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc.

The Original Grant also gave the independent counsel the authority to "investigate other allegations or evidence of violation of any federal criminal law . . . by any person or entity developed during the Independent Counsel's investigation referred to above *and connected with or arising out of* that investigation." (Emphasis added). The Original Grant gave the independent counsel further authority to investigate "any violation of 28 U.S.C. § 1826, or any obstruction of the due administration of justice, or any material false testimony or statement in violation of federal criminal law, in connection with any investigation of the matters described above," as well as the activities of any coconspirators and/or aiders and abettors "involved in any of the matters described above." Finally, presumably in order to ensure that the independent counsel was given all the authority he must have under the Ethics in Government Act, the Special Division recited the exact language of § 593(b)(3):

1. Although dismissal of the entire indictment makes it unnecessary to decide any of the other motions, the certainty of appellate review makes it prudent to rule on all of the important questions presented.

2. Independent counsel Starr was appointed pursuant to the Ethics in Government Act of 1978, as amended by the Independent Counsel Reau-

thorization Act of 1994, *see* 28 U.S.C. §§ 591–599.

3. The Special Division is a panel of three judges designated by the Chief Justice and assigned to a division of the United States Court of Appeals for the District of Columbia "for the purpose of appointing independent counsels." 28 U.S.C. § 49.

[The Special Division] shall assure that the independent counsel has adequate authority to fully investigate and prosecute the subject matter with respect to which the Attorney General has requested the appointment of the independent counsel, and all matters related to that subject matter. Such jurisdiction shall also include the authority to investigate and prosecute Federal crimes ... that may arise out of the investigation or prosecution of the matter with respect to which the Attorney General's request was made, including perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses.

Section 594(e) of the Ethics in Government Act allows an independent counsel to ask either the Attorney General or the Special Division to refer "matters related to the independent counsel's prosecutorial jurisdiction." One month after the Original Grant, acting pursuant to § 594(e), the independent counsel requested, and the Special Division granted, the referral to his office of certain matters dealing with defendant Webster L. Hubbell. Specifically, the Special Division "expressly expanded"[4] the independent counsel's jurisdiction to include:

[W]hether Webster L. Hubbell, a covered person under 28 U.S.C. § 591(b), violated any federal criminal law (including mail fraud and criminal tax violations) in his billing or expense practices while a member of the Rose Law Firm, and [ ] all matters arising from that investigation to the same extent as all other criminal matters arising under the jurisdiction set forth in the original order.

*In re Madison Guaranty Savings & Loan Association (Webster L. Hubbell)*, (Spec.Div. Sept. 1, 1994) (hereinafter "Billings Referral"). The independent counsel thereafter brought charges against Mr. Hubbell for fraudulent billing while he was in the private practice of law in Little Rock, Arkansas, and for income tax evasion. Mr. Hubbell pleaded guilty to two counts of mail fraud and tax evasion on December 6, 1994. He was sentenced to twenty-one months' imprisonment

and was incarcerated from August 7, 1995 to February 12, 1997.

On January 6, 1998, the Special Division granted another request by the independent counsel for referral of matters involving Mr. Hubbell. It is this second Hubbell referral that gives rise to the present case and this motion. It gave the independent counsel authority to investigate

(i) whether Webster L. Hubbell or any individual or entity violated any criminal law, including but not limited to criminal tax violations and mail and wire fraud, regarding Mr. Hubbell's income since January 1, 1994, and his tax and other debts to the United States, the State of Arkansas, the District of Columbia, the Rose Law Firm, and others; and

(ii) whether Webster L. Hubbell or any individual or entity violated any criminal law, including but not limited to obstruction of justice, perjury, false statements, and mail and wire fraud, related to payments that Mr. Hubbell has received from various individuals and entities since January 1, 1994.

*In re Madison Guaranty Savings & Loan Association*, (Spec.Div. Jan. 6, 1998) (hereinafter "Tax Referral"). A grand jury in this District handed up this indictment of Mr. Hubbell, his wife, his accountant, and his tax lawyer, on April 30, 1998. All ten counts of the indictment relate to an alleged scheme to avoid paying the taxes Mr. Hubbell agreed to pay as part of his 1994 guilty plea and taxes on income Mr. Hubbell received after leaving the Department of Justice in 1994.

**A. Reviewability of the Special Division's referral order**

 The independent counsel's first response to this motion was to challenge defendants' right to question his authority. He said in his written response, using the language of standing, that defendants had "identified no concrete harm that has accrued (or will accrue) to them because the Independent Counsel is prosecuting this matter, rather than the Department of Justice," p. 14. The

---

4. These words have no effect. The Special Division does not have the power to "expand" the jurisdiction of an independent counsel under

§ 594(e). *Morrison v. Olson*, 487 U.S. at 680 n. 18, 108 S.Ct. 2597.

scope of this argument was limited by the independent counsel's concession, at oral argument, that a criminal defendant is indeed harmed by an *ultra vires* indictment and that these defendants would have had standing to challenge the independent counsel's jurisdiction if the Special Division had not issued the Tax Referral. Tr. at 63, 79–80.[5] What remains of the independent counsel's standing argument, accordingly, is the assertion that the Special Division's Tax Referral is unreviewable, or, at least, that it is not reviewable by a United States District Court.

That core argument requires analysis of the exact nature of a referral order under § 594(e) of the Ethics in Government Act: Is it, as this independent counsel asserts, a nonreviewable discretionary act? Is it, as two judges of this Court have suggested, controlling authority in this Circuit, or at least precedent flowing from the proper exercise of an appellate court's Article III powers? Or is it a ministerial act, flowing from the Special Division's Article II or III powers, that is reviewable on a proper challenge?

*Nonreviewable discretionary act:* In *United States v. Tucker,* 78 F.3d 1313, 1317 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 76, 136 L.Ed.2d 35 (1996), the Eighth Circuit held that a referral to the independent counsel of a "related" matter under § 594(e) *by the Attorney General* is a nonreviewable act of prosecutorial discretion. The *Tucker* case did not involve a referral *by the Special Division* and is not precedent for the question presented here. If a Special Division referral order were an unreviewable act of prosecutorial discretion, the referral power would be unconstitutional. *Morrison v. Olson* allowed the independent counsel statute to pass constitutional muster only because the duties assigned to the Special Division are either so limited as to be merely ancillary to the powers assigned to judges under the Appointments Clause (this is *Morrison*'s characterization of the Special Division's

power to define an independent counsel's jurisdiction), or "essentially ministerial," *see Morrison,* 487 U.S. at 681, 108 S.Ct. 2597. The Special Division would be acting in an unconstitutional "supervisory" executive capacity if it exceeded those limits. *See id.* at 680–81, 108 S.Ct. 2597 (citing *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). A § 594(e) referral by the Special Division cannot constitutionally be an unreviewable discretionary act.

*Controlling authority or precedent:* The Special Division consists of three Article III judges sitting as a division of the D.C. Circuit, *see* Note 3, *supra.* Two judges of this District Court, both confronted with challenges to a § 594(e) referral related to an independent counsel investigation of a former Secretary of Agriculture, concluded that they were bound by the referral:

> Congress designated the Special Division a "division of the United States Court of Appeals for the District of Columbia Circuit." 28 U.S.C. § 49. For this court to review the constitutionality of the referral jurisdiction granted in *In re Espy* would require it to sit in an appellate capacity over the D.C. Circuit, which it cannot and will not do. If the Special Division concluded that "the new matter is demonstrably related to the factual circumstances that gave rise to the Attorney General's initial investigation and request for appointment of an independent counsel," ... this court is not empowered to disturb those findings. Nor may this court substitute its own constitutional analysis of § 594(e) ....

*United States v. Blackley,* 986 F.Supp. 607, 616 (D.D.C.1997) (Lamberth, J.); *see also United States v. Espy,* 989 F.Supp. 17, 33 (D.D.C.1997) (Urbina, J.).

I respectfully disagree and conclude that the Supreme Court's analysis in *Morrison v.*

---

**5.** The independent counsel was right to make those concessions. Defendants may, and do, challenge the authority of their prosecutors. *See Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (contempt conviction reversed where court improperly appointed the beneficiary of the contempt order to prosecute defendant for violat-

ing that order); *United States v. Wilson,* 26 F.3d 142, 147–48 (D.C.Cir.1994) ("The core of their claim is ... that the OIC [ ] withdrew any authority that the Florida [United States Attorney] otherwise had to investigate and conduct grand jury proceedings"), *cert. denied sub nom. Briscoe v. United States,* 514 U.S. 1051, 115 S.Ct. 1430, 131 L.Ed.2d 311 (1995).

*Olson* compels a different answer.[6] The Ethics in Government Act provides for the designation of three judges and for their assignment to a division of the D.C. Circuit, but *only* "for the purpose of appointing independent counsels," 28 U.S.C. § 49(a). *Morrison* made it clear that the power to appoint independent counsels derives solely from the Appointments Clause, Art. II, § 2, cl. 2, which enables judges to appoint inferior officers of the United States government. 487 U.S. at 676–77, 108 S.Ct. 2597. "While nominally a division of the Court of Appeals for the District of Columbia Circuit, the Special Division has no functional relationship to the Court of Appeals.... Further, because the Division must include two judges who are not members of the Court of Appeals for the D.C. Circuit, it cannot constitute a panel of the Court authorized to decide 'cases or controversies' within the jurisdiction of the D.C. Circuit, and subject to the Court's *en banc* review." *In the Matter of Charge of Judicial Misconduct or Disability*, 39 F.3d 374, 378 (D.C.Cir.1994).

■ The Special Division in fact is not a court of appeals. The Special Division hears referral applications *ex parte*, as judges hear wiretap applications, 18 U.S.C. §§ 2516, 2518. And, like wiretap orders, referral orders could not be immune from collateral attack or appellate review. If they were, the effect would be to make binding on affected individuals rulings that were never litigated in an adversarial proceeding.

*Ministerial act:* The Supreme Court in *Morrison v. Olson* suggested that, while the Special Division's power to appoint independent counsels derives from Article II, other duties of the Special Division do not, including its § 594(e) referral power. *Morrison*, 487 U.S. at 680, 108 S.Ct. 2597 ("The Act also vests in the Special Division various powers and duties in relation to the independent

counsel that, because they do not involve appointing the counsel or defining his or her jurisdiction, cannot be said to derive from the Division's Appointment Clause authority"). Those other duties the Court called "essentially ministerial" and not repugnant *for that reason* to the case or controversy requirement of Article III, even though they "do not necessarily or directly involve adversarial proceedings with a trial or appellate court." *Id.* at 681 n. 20, 108 S.Ct. 2597. In reaching this conclusion, the Court noted that Article III courts have traditionally performed a number of similar functions *ex parte*, such as authorizing wiretaps, compelling the testimony of witnesses before grand juries, and issuing search warrants. *See id.* at 681–82, 108 S.Ct. 2597.[7]

■ If the Special Division's § 594(e) referral function is an Article III function, it must be ministerial, rather than "supervisory" or "executive," or it violates Article III. *Id.* The Special Division thus may *interpret* the independent counsel's Original Grant. It may not *expand* the independent counsel's jurisdiction without the consent of the Attorney General, which consent is required by another part of the Act (§ 593(c)(2)). *Id.* at 680 n. 18, 108 S.Ct. 2597. This limitation is constitutional, and, if it is to mean anything at all, must be enforceable upon a proper challenge.

It may also be correct to classify the Special Division's referral power under Article II, as ancillary to the power to appoint inferior officers under the Appointments Clause. The *Morrison* Court suggested otherwise, as noted *supra*, but the Court also noted that the power to refer matters related to the independent counsel's original jurisdiction may legitimately *include* the ability to interpret the scope of the jurisdiction. *Id.* at 685 n. 22, 108 S.Ct. 2597.

---

6. The independent counsel does not contend otherwise. Tr. at 68.

7. It is worth noting that none of the ministerial acts used as analogies in the Supreme Court's *Morrison* decision are unreviewable. *See, e.g.,* 18 U.S.C. § 2518(10)(a) (permitting aggrieved parties to challenge introduction of wiretap evidence against them in later proceedings); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d

527 (1983) (permitting challenge to facial validity of search warrant where supporting affidavit contained information from an anonymous informer); *Brown v. United States*, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959) (permitting appeal of witness's challenge to court's contempt order where witness refused to testify before grand jury after immunity granted).

■ Labeling the referral function as ancillary to an Article II function does not affect the reviewability of § 594(e) referral orders of the Special Division. A referral order provides the authorization necessary for the independent counsel to present evidence to a grand jury. Defendants' claim may thus be viewed as a challenge to this court's jurisdiction, *see e.g., United States v. Navarro,* 959 F.Supp. 1273, 1277–78 (E.D.Cal.1997) (unauthorized attorney's presence before a grand jury implicates the court's jurisdiction); *United States v. Mendoza,* 957 F.Supp. 1155, 1156–57 (E.D.Cal. 1997) ("The courts need some assurance that the virtually unlimited and unreviewable discretion of a federal prosecutor in deciding whether to seek an indictment, and on what charges, is exercised by an authorized person and not some interloper"); *see also United States v. Providence Journal Co.,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988) (dismissing writ of certiorari for lack of jurisdiction where the initial petition was filed by a government lawyer acting without authority to do so).[8]

## B. Relatedness of the Tax Referral to the Original Grant

■ The Special Division may authorize an independent counsel to investigate matters that are "demonstrably related" to the Attorney General's application for appointment. *Morrison v. Olson,* 487 U.S. at 679, 108 S.Ct. 2597. It follows, and is undisputed, that the "demonstrably related" rule governs referrals as well. *See id.; see also Tucker,* 78 F.3d at 1321. The Special Division itself has stated:

> [A] matter referred by this court, rather than by the Attorney General, has to meet an apparently higher standard of being "demonstrably related" .... "[R]elatedness for purposes of referral under § 594(e) depends upon the procedural and factual link between the OIC's original prosecutorial jurisdiction and the matter sought to be referred." *Tucker,* 78 F.3d at 1313.

*In re Espy,* 80 F.3d 501, 507–508 (D.C.Cir. 1996) ("*Espy I* "). In granting the referral application in. *Espy I,* the Special Division was persuaded that "the referral matter overlaps his current jurisdiction in terms of persons involved, witnesses, patterns of conduct, and applicable law, and that the factual basis of the referral matter arose directly from" the independent counsel's investigation of the Secretary's alleged receipt of illegal gifts. *Espy I,* 80 F.3d at 508. The Special Division very recently applied the same standard to deny referral of a different Espy matter, because there it found that the application raised "allegations concerning criminal conduct on the part of Secretary Espy and others in violation of other criminal statutes outlawing a different category of conduct and occurring on different occasions than those set forth in the grant of jurisdiction." *In re Espy,* 145 F.3d 1365 (D.C.Cir.1998) ("*Espy II* "). The *Espy II* decision rejected the rationale advanced by the independent counsel in that case, that "the matters are related because of the common prospective subject, the common concern for misconduct by a high official and the potential presence of eight unnamed common witnesses." *Id.*

■ The Special Division's analysis in the *Espy* matters is persuasive and appears to comport with *Morrison.* In the present case, however, the reasons for the Special Division's decision to issue the Tax Referral are unstated. It is impossible to tell whether the same analysis was applied or what record was before the Special Division. We do not know, for example, whether the Attorney General responded to the independent counsel's § 594(e) application in this case, whereas in the *Espy* matters the Attorney General objected to the referral applications, forcing the Special Division to resolve the dispute. In any event, and bearing respectfully in mind that it is only the independent counsel that has "intimate knowledge of the course of the investigation, including witness statements, and of other proceedings that may be ongoing before the grand jury," *Tucker,* 78 F.3d at 1318, I must determine whether the independent counsel has shown that the Tax

---

**8.** Alternatively, the claim may be viewed as a "nonjurisdictional structural constitutional objection[ ]," *see Freytag v. Commissioner of Inter-*

*nal Revenue,* 501 U.S. 868, 878–79, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (citing cases), but this is a distinction without a difference.

Referral is "demonstrably related" to the Original Grant. A mixed question of law and fact will be reviewed for clear error as to factual findings and *de novo* as to legal conclusions. *See Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *United States v. Garrett,* 959 F.2d 1005, 1007 (D.C.Cir.1992). Where, as here, there are no factual findings, the review is effectively *de novo.*

The Madison–Whitewater matters that were the subject of the Original Grant and the tax matters that are the subject of this case have nothing in common—nothing, at least, that appears on this record—except Webster Hubbell. The independent counsel has made no serious effort to show the "overlap" found to exist in the *Espy I* referral. He has identified no common witnesses, described no similar patterns of conduct, cited no similar applicable law. Nor has the independent counsel offered any real resistance to defendants' submission that this case involves "violations of other criminal statutes outlawing a different category of conduct and occurring on different occasions than those set forth in the [Original Grant] of jurisdiction." *Espy II, supra.* The independent counsel's explanation of how this indictment is "connected with" the Original Grant was a recitation spanning six degrees of relationship. Tr. at 75. I find the asserted connection too attenuated and conclude that neither the Tax Referral order nor the indictment is "connected with" or "demonstrably related to" the Original Grant.

When pressed to demonstrate the relationship between the Tax Referral and the Original Grant, indeed, the independent counsel always returns to what seems to be his default position: that he has always been authorized to investigate obstruction of his original investigation; that, pursuing that line, he investigated Mr. Hubbell's post-conviction consulting income "from entities associated with the Clinton Administration at a time when Mr. Hubbell clearly was under investigation, and known publicly to be an important witness regarding Madison Guar-

anty/Whitewater matters," Response at 23; and that he discovered these tax charges in the course of that inquiry.

That default position relies directly upon the Original Grant and effectively jettisons the Tax Referral order.[9] The argument is that, so long as the independent counsel is investigating obstruction, he may prosecute whatever crimes he may come across, committed by whomever he may come across, regardless of whether the charges or the individuals are demonstrably related in any substantive way to the Original Grant, and regardless of whether he has found any obstruction. Response at 7–8, 22, 27–28; Tr. at 74–77.

■ This argument invokes the other half of the Original Grant of authority to investigate matters "connected with or *arising out of* " the Madison Guaranty/Whitewater investigation. The term "arising out of," as it is used in the Ethics in Government Act, refers to obstruction of the independent counsel's investigation. *See* 28 U.S.C. § 593(b)(3) (arising out of jurisdiction includes "perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses.") It is not disputed that the independent counsel has jurisdiction to investigate and prosecute such conduct. But his argument here is that he is entitled to investigate matters that "arise out of" investigation of matters that "arise out of" the Original Grant.

The controlling constitutional principles articulated in *Morrison* would be offended by permitting the independent counsel to tack these tax charges onto the Original Grant on the theory that they "arose out of" an apparently unsuccessful investigation of allegations that Mr. Hubbell was involved in an obstruction of the original Whitewater investigation. Defendants have argued, without any effective response from the independent counsel, that his position, if adopted, would allow the independent counsel to "stray in as many directions and ... as far in any given direction as [his] energy and zeal might take

9. At oral argument, in fact, independent counsel minimized the importance of the Tax Referral, calling it a "belt-and-suspenders" device. Tr. at 76. That drew from defense counsel the specula-

tion that another motive for the referral application may have been an attempt to insulate the independent counsel's authority from judicial review. Tr. at 81–82.

him.... [T]he Attorney General, when ceding a piece of the Justice Department's jurisdiction, would have no way of knowing how much jurisdiction the Independent Counsel might later take." Brief at 3. The "demonstrable relationship" requirement will not support the prosecution of factually unrelated charges whose only connection to the Original Grant is that they "arose out of" an obstruction investigation, which in turn "arose out of" the Original Grant.

Had the independent counsel applied for a referral from the Attorney General under § 594(e), as he did in *Tucker, supra,* or asked the Attorney General to petition the Special Division to expand his jurisdiction under § 593(c), as he did in the investigation of the matters involving Monica Lewinsky, *see In re Motions of Dow Jones & Co.,* 142 F.3d 496 (D.C.Cir.1998), *petition for cert. filed,* 66 U.S.L.W. 3790 (1998) (No. 97–1959), he might have received proper authority—or at least unreviewable authority—to prosecute these charges. As it is, however, the indictment must be dismissed.

## II. MOTION TO DISMISS AS TO WEBSTER HUBBELL FOR VIOLATION OF HIS USE IMMUNITY

On November 1, 1996, after the independent counsel had successfully prosecuted Webster Hubbell under the Billings Referral, and while Mr. Hubbell was still in prison, the independent counsel served him with a subpoena commanding the production of all his business, financial, and tax records from January 1, 1993 to the date of the subpoena. Mr. Hubbell refused to comply, invoking his Fifth Amendment privilege against self-incrimination. The independent counsel thereupon moved for, and the United States District Court for the Eastern District of Arkansas granted, an order compelling production of the documents. Pursuant to 18 U.S.C. § 6002, the order also granted Mr. Hubbell "immunity to the extent allowed by law." *In re Grand Jury Subpoena American Broadcasting Companies, Inc.,* 947 F.Supp. 1314 (E.D.Ark.1996). Mr. Hubbell complied with that order and produced 13,120 pages of documents to the indepen-

dent counsel. While the original purpose of the subpoena was to investigate allegations of obstruction of justice, the independent counsel brought no obstruction charges. Instead—and the independent counsel concedes this important point—he "used the contents of these documents to identify and develop evidence that led to this prosecution." Response at 5. Webster Hubbell now invokes the use immunity given to him with the order to compel production and moves to dismiss the charges against him or, in the alternative, for a *Kastigar* hearing to determine whether the independent counsel has impermissibly used any of his immunized testimony against him. *See Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

### A. Use immunity

The "use and derivative use" immunity statute, 18 U.S.C. § 6002, provides that, where a witness validly asserts the privilege against self-incrimination and is given use immunity, the witness may not refuse to testify,

> but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

This provision was enacted in the Omnibus Crime Control Act of 1970 to implement a suggestion by the Supreme Court that, contrary to the conventional wisdom of the time, a statute providing that testimony might be compelled under something less than full transactional immunity might satisfy the Fifth Amendment. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (compulsion of testimony over assertion of right against self-incrimination permissible if "the witness and the Federal Government [are left] in substantially the same position as if the witness

had claimed his privilege in the absence of" a grant of immunity.) [10]

Section 6002 was tested and upheld in *Kastigar*. The Supreme Court found that § 6002 "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity is therefore coextensive with the privilege and suffices to supplant it." *Id.* 406 U.S. at 462, 92 S.Ct. 1653. Moreover, the Court noted, a witness granted immunity under the statute and then prosecuted "is not dependent upon the integrity and good faith of the prosecuting authorities," *id.* at 460, 92 S.Ct. 1653, because he "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* at 461–62, 92 S.Ct. 1653.

The requirement of § 6002 that "no information directly or indirectly derived from [immunized] testimony or other information [gained through a grant of immunity]" may be used against an immunized witness, and *Kastigar*'s prohibition on "any use" of immunized testimony, *see* 406 U.S. at 460, 92 S.Ct. 1653, have been strictly adhered to in this Circuit. In *United States v. North*, 920 F.2d 940, 941–42 (D.C.Cir.1990) *(per curiam)* ("*North II*"), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), the court held that the prosecution of Oliver North might be infirm even though the prosecution had sealed its evidence with the court before the defendant gave his immunized Congressional testimony.[11] The problem, the court held, was the possibility that witnesses against the defendant might have seen his immunized testimony on television and allowed it to taint their own trial testimony.

The independent counsel has indicated that a *Kastigar* hearing is unnecessary because he "will make no bones about the fact that

[he] did use the information provided by Mr. Hubbell pursuant to the production immunity." Tr. of Status Conf., June 2, 1998, at 8. He argues that the instant motion "will rise and fall on the law." *Id.* The independent counsel did not qualify that oral statement in his written submission on the question, but remained committed to· his position that "there is no need for a hearing pursuant to *Kastigar* . . . ," because it was appropriate for him to "examine the records' contents to find and develop evidence for this prosecution." Response at 21. *See also id.* at 3 ("it was appropriate for the United States to use the records' contents to identify and develop evidence"). Those concessions compel me to find, and I do find, that all of the evidence the independent counsel would adduce at trial in support of the charges brought against these defendants was directly or indirectly derived from the documents Mr. Hubbell produced under subpoena.

### B. Act-of-production immunity

The independent counsel's argument in opposition to the motion to dismiss starts, not with § 6002 or with *Kastigar*, but from the premise that the contents of voluntarily prepared documents are never protected by the Fifth Amendment privilege. *See Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). From this premise, which is beyond dispute, the independent counsel contends that only Mr. Hubbell's act of producing the documents needed to be immunized, that the "to the extent allowed by law" language of the immunity order extended only to the act of production, and that it was accordingly legitimate for the independent counsel to use the documents themselves, and their contents, to discover and build his case against Mr. Hubbell. He asserts that all the documents, and all the information derived from

---

10. Before *Murphy*, it was assumed that testimony could be compelled consistently with the Fifth Amendment only under a grant of full transactional immunity. *See Counselman v. Hitchcock*, 142 U.S. 547, 586, 12 S.Ct. 195, 35 L.Ed. 1110 (1896) ("a statutory [immunity statute], to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.")

11. North had been given use immunity for his Congressional testimony pursuant to § 6002. *See United States v. North*, 910 F.2d 843, 851 (D.C.Cir.1990) *(per curiam)* ("*North I*"), *opinion withdrawn and superseded in part, see North II.*

them, may be used against Mr. Hubbell at trial and that "the United States is free to use the records' contents to create a link" between the defendant and the records, Response at 16, but only so long as the factfinder is never told that it was Mr. Hubbell who produced the documents.[12]

 The cases do not answer the precise question presented here, but they do provide guidance. The Fifth Amendment is implicated by the compelled production of unprivileged documents only when one or more testimonial aspects of the act of production is itself incriminating. *Fisher*, 425 U.S. at 409–411, 96 S.Ct. 1569; *Doe*, 465 U.S. at 612–13, 104 S.Ct. 1237. The testimonial aspects of the act of production are: (1) that documents exist; (2) that the person producing them possessed them; and (3) that they are authentic. *Fisher*, 425 U.S. at 410–11, 96 S.Ct. 1569. Even if one or more of those testimonial aspects is incriminating, the Fifth Amendment privilege does not attach unless it, or they, add to the "sum total of the government's information." *Id.* at 411, 96 S.Ct. 1569. A grant of immunity must be "as broad as the privilege" itself, *Doe*, 465 U.S. at 617 n. 17, 104 S.Ct. 1237; *see also Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653 ("a grant of immunity must afford protection commensurate with that afforded by the privilege"); *Sealed Case I*, 791 F.2d at 182 ("the scope of immunity afforded by § 6002 is, by definition, whatever is necessary to protect the witness's privilege against self-incrimination"), and it must leave the witness "in substantially the same position" as if he had asserted the Fifth Amendment. *Murphy*, 378 U.S. at 79, 84 S.Ct. 1594. If and to the extent there is immunity after the application of these principles, then both the statute and

*Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653, require that the immunity protect not only the actual testimony or information compelled, but also its fruits.

The necessary analysis thus determines, first, which aspect or aspects of the defendant's production of documents was testimonial: Did he implicitly testify only that the documents were authentic, or only that they were in his possession, or did he also implicitly testify as to their very existence? The answer to that question determines the breadth of the privilege and the breadth of the immunity that has been granted.[13]

 The independent counsel's central argument here (which may be characterized as "no problem as long as the finder of fact never learns who produced the documents") might be viable if the only testimonial aspects of Mr. Hubbell's production under subpoena were authenticity and possession. But the argument fails because it does not cover—indeed, it practically ignores—the question of the documents' existence. The documents Mr. Hubbell turned over under subpoena *concededly* added to the "sum total" of the independent counsel's information about him. The independent counsel does not claim that he knew *any* of the facts relevant to the charges in this indictment at the time of the subpoena: he conceded at oral argument that he learned of the Bridgeport Group, the F.B.O. account at the Pulaski County Bank, and the "pension account check swap" charged in the indictment only through the documents. Tr. at 34; *see also* Response at 21 n. 7. The subpoena itself was so broad as to belie any previous knowledge of those allegations. *See, e.g.,* Subpoena Rider, ¶¶ A and B (requesting "[a]ny and all

---

12. At oral argument, the independent counsel relied heavily for this proposition upon *United States v. Porter*, 711 F.2d 1397 (7th Cir.1983). That decision has been characterized by the Court of Appeals for this Circuit as "inconsistent not only with *Kastigar* and the holdings of other Circuits ..., but also with prior expressions of the Seventh Circuit itself." (citations omitted). *In re Sealed Case*, 791 F.2d 179, 182 (D.C.Cir.) (Scalia, J.), *cert. denied sub nom. Wiggins v. United States*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) ("*Sealed Case I* ").

13. The one Supreme Court Justice to have addressed the effect of act-of-production immunity on a subsequent prosecution suggested a similar mode of analysis. *See Fisher*, 425 U.S. at 433–34, 96 S.Ct. 1569 (Marshall, J., concurring) (permissible use of documents depends on which testimonial components of production were implicated by the subpoena). This framework is also supported by several commentators. *See* Robert P. Mosteller, *Simplifying Subpoena Law: Taking the Fifth Amendment Seriously*, 73 Va. L.Rev. 1, 41–43 (1987); Kenneth J. Melilli, *Act-of-Production Immunity*, 52 Ohio St.L.J. 223, 258–60 (1991).

documents reflecting, referring, or relating to any direct or indirect sources of money or other things of value" from 1993 to 1996); *id.* ¶ C (requesting "[a]ll bank records of Webster Hubbell, his wife, or children for all accounts" from 1993 to 1996); *id.* ¶ D (requesting "[a]ny and all documents reflecting, referring, or relating to time worked or billed by Webster Hubbell" from 1993 to 1996); *id.* ¶ E (requesting "[a]ny and all documents reflecting, referring, or relating to expenses incurred by and/or disbursements of money by Webster Hubbell during the course of any work performed" from 1993 to 1996). Indeed, the independent counsel was not even pursuing tax evasion charges at the time of the subpoena. *See* Response to Jurisdiction Motion, at 7–8, 22–23. The independent counsel does not—and at oral argument conceded that he could not, *see* Tr. at 20–21—claim that these documents would have been obtained by means of a search warrant based on probable cause. Independent counsel asserted at oral argument that he could have "gotten a Dun & Bradstreet" on Mr. Hubbell, "subpoenaed the individual banks ... gone to the papers he filed with the IRS ... the accountant ... [and] his credit card companies." Tr. at 22. He did not explain, however, how he would have known what to look for in order to find such things as the Pulaski County Bank account, which was not even in Mr. Hubbell's name. The assertion of counsel does not begin to show that the independent counsel's knowledge of the documents or their contents was a "foregone conclusion," *Fisher*, 425 U.S. at 411, 96 S.Ct. 1569, or meet *Kastigar*'s "heavy burden" of proving that "all evidence [the prosecution] seeks to introduce is untainted by the immunized act of production." *Sealed Case I*, 791 F.2d at 182.

The Fifth Amendment implications of compliance with a subpoena like the one in this case were discussed in *United States v. Fox*, 721 F.2d 32, 38 (2nd Cir.1983). There, the court held that a "broad-sweeping summons" seeking all books and records of a sole proprietorship implicated the "existence" component of compelled testimonial communication identified in *Fisher. Id.* Such a summons, the court held, appeared to be an "attempt[ ] to compensate for [the prosecutor's] lack of knowledge by requiring [the witness] to become the primary informant against himself. [citations omitted.] It is precisely this sort of fishing expedition that the Fifth Amendment was designed to prevent." *Id. See also In re Sealed Case*, 832 F.2d 1268, 1280 (D.C.Cir.1987) (document subpoena unenforceable absent immunity unless government shows that it "possesses sufficient evidence to render [the testimonial components of production] a 'foregone conclusion'") ("*Sealed Case II*");[14] *U.S. v. Argomaniz*, 925 F.2d 1349, 1356 (11th Cir.1991) (lower court's enforcement of subpoena absent immunity reversed because witness "would actually be informing the government that he had income in the years in question"); *In re Grand Jury Proceedings, Subpoenas for Documents*, 41 F.3d 377, 380–81 (8th Cir. 1994) ("broad-sweeping" subpoena unenforceable absent immunity because compliance would require witness to "provid[e] identifying information"); *In re Heuwetter*, 584 F.Supp. 119, 126 (S.D.N.Y.1984) (subpoena unenforceable absent immunity because "the Government ... is clearly uncertain about the existence of the documents and [ ] the forced production of these papers may compel the [movant] to add to the sum total of the government's information") (citations and internal quotations omitted); *In re Grand Jury Investigation*, 599 F.Supp. 746, 748 (S.D.Tex.1984) (compelled disclosure of documents unenforceable absent immunity because, while "the government appears to

---

**14.** The main holding of *Sealed Case II* (which involved the application of the Fifth Amendment to a custodian of records of a collective entity) has been effectively overruled by *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), and the District of Columbia Circuit has recognized as much, *see In re Sealed Case (Government Records)*, 950 F.2d 736 (1991). *Braswell*, however, did not concern the language of *Sealed Case II* relevant here. Indeed, at least in dicta, it lends support to defendant's position. *See* 487 U.S. at 117, 108 S.Ct. 2284 ("a grant of act of production immunity can have serious consequences.... Even in cases where the Government does not employ the immunized testimony for any purpose—direct or derivative—against the witness, the Government's inability to meet the 'heavy burden' it bears may result in the preclusion of crucial evidence that was obtained legitimately.")

have some evidence," movant's compelled compliance may "provid[e] the government with the incriminating link necessary to obtain an indictment"); *In re Grand Jury Subpoenas Served Feb. 27, 1984*, 599 F.Supp. 1006, 1015–16 (E.D.Wash.1984) (subpoena that would require witness to provide "information the government does not already have" implicates existence and possession prongs of *Fisher* unless government meets burden of showing that " 'possession [and] existence ... [are] a foregone conclusion' ") (citing *Doe*, 465 U.S. at 614 n. 13, 104 S.Ct. 1237); *United States v. McCollom*, 651 F.Supp. 1217, 1222–23 (N.D.Ill.) (subpoena not enforced on grounds of judicial economy as it relates to accounts not already known to government because "there is little point in forcing [target] to produce documents that the government cannot use either directly or derivatively"), *aff'd*, 815 F.2d 1087 (7th Cir. 1987); *cf. In re Grand Jury Subpoena Duces Tecum Dated Nov. 13, 1984*, 616 F.Supp. 1159, 1161 (E.D.N.Y.1985) (existence prong of *Fisher* not implicated because "the government's ex parte affidavit establishes that much is known about this petitioner's activities. The government is aware that he keeps a set of partnership books, and is aware of two bank accounts").[15]

The subpoena served on Mr. Hubbell was the quintessential fishing expedition. The independent counsel freely admits that he was not investigating tax-related charges when he issued it. Response to Jurisdiction Motion, at 7–8. Instead, he "learned about the unreported income and other crimes from studying the records' contents," Response at 21 n. 7. His application for authority to *investigate* potential tax violations by the Hubbells was not filed with the Special Division until December 31, 1997, fourteen months *after* the subpoena had issued.

Mr. Hubbell's compelled production of documents allowed the independent counsel to build a case against Mr. Hubbell different in all material respects from the case for which they had been subpoenaed. Mr. Hubbell was thereby turned into the primary informant against himself.

The motion to dismiss all counts against defendant Webster Hubbell must be granted.

## III. MOTION TO DISMISS MAIL AND WIRE FRAUD COUNTS

■ All defendants move to dismiss Count Six (wire fraud) and Counts Seven through Ten (mail fraud) for failure to state an offense. Count Six involves a fax transmission from defendant Schaufele to the Hubbells' lawyers. Counts Seven through Ten involve four tax notices mailed to the Hubbells by the District of Columbia Department of Finance and Revenue. The argument is that the notices and the fax could not have been "in furtherance of" the alleged fraudulent activity (evasion of taxes), because they demonstrate an attempt by the tax authorities to thwart that activity.

■ The indictment charges that defendants' uses of the wires and mails were "for the purpose of executing, and attempting to execute, and aiding and abetting the execution of the [alleged] scheme and artifice to defraud." Indictment, ¶ 102. Mere citation to the language of the statute does not suffice to charge fraudulent activity, *see United States v. Nance*, 533 F.2d 699, 702 (D.C.Cir. 1976), but an indictment will withstand a motion to dismiss if it sets forth the elements of the offense with sufficient factual detail to put defendants on notice of the nature of the accusation against them. *Russell v. United States*, 369 U.S. 749, 766–68, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The indictment in this case meets that standard.

---

15. The independent counsel's assertion, in footnote 6 of its Response, that it knew from its earlier prosecution of defendant that he "created business records and income records for himself and his family" is of no moment. The "existence" prong of the *Fisher* analysis goes to the existence of the information contained in the documents, not to the fact that the witness keeps records. *See Fisher*, 425 U.S. at 411 ("existence [is] a foregone conclusion [because] the taxpayer adds little or nothing to the sum total of the government's information by conceding that he has the papers"); *Fox*, 721 F.2d at 37–38 (irrelevant that government knew doctor kept business records, because "IRS had no way of knowing [from information already available to it] whether he has records to support all of his claimed deductions; [or] whether he possesses records that reflect unreported taxable income.")

Defendants may be correct in their assertion that the independent counsel will have difficulty proving that the tax notices mailed by the District of Columbia were in furtherance of the alleged scheme. *See United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *United States v. Pick,* 724 F.2d 297 (2nd Cir.1983). The independent counsel avers, however, that defendants used the tax notices to keep track of the District of Columbia government's progress in collecting the back taxes, so that they could more effectively plan the course of their evasion. Whether the evidence proves that proposition will be for the jury to decide, or perhaps will be the subject of a motion under F.R.Crim.P. 29.

The motion to dismiss Counts Six through Ten will be denied.

## IV. MOTION TO DISMISS THE OMNIBUS TAX COUNT

■ All defendants move to dismiss Count Two, which charges a violation of the "omnibus" clause of 26 U.S.C. § 7212(a). The theory of the motion is that the Independent Counsel Reauthorization Act of 1994 requires independent counsels to comply with written policies of the Department of Justice, and that the Department of Justice Manual forbids government prosecutors to charge violations of the "omnibus" clause in tax evasion cases like this one.

The short answer to this motion is that the DOJ Manual does not prohibit such a charge, but only discourages it. Department of Justice Manual, Tax Division, Tax Directive No. 77, instructs DOJ attorneys as follows:

> In general, the use of the "omnibus" provision of Section 7212(a) should be reserved for conduct occurring after a tax return has been filed—typically conduct designed to impede or obstruct an audit or criminal tax investigation, when 18 U.S.C. Section 371 charges are unavailable .... [T]his charge might also be appropriate when directed at parties who engage in large-scale obstructive conduct ... [or who] continually assist[ ] taxpayers in the filing of false returns ...; [or who commit]

other numerous, large scale violations of [the tax code] (as it pertains to refund claims for other or fictitious taxpayers) .... [T]he overall purpose of Section 7212(a) ... is to penalize conduct aimed directly at IRS personnel in the performance of their duties, and at general IRS administration of the federal tax enforcement program, but not to penalize tax evasion as such.

> The omnibus clause should not be utilized when other more specific charges are available and adequately reflect the gravamen of the offense ....

This Directive uses the precatory words "should" and "should not," and even those words are qualified by the phrase "in general." No mandatory words are used, even though the DOJ Manual is replete with directives framed in mandatory language. *See, e.g.,* Tax Division Directive No. 86–58 ("the Tax Division trial attorney shall initially contact the United States Attorney's office and discuss the case with the appropriate Assistant United States Attorney"); U.S. Attorneys Manual, Criminal Tax, § 6–4.340 ("Under no circumstances ... will the government recommend that there be no period of incarceration"); *Id.* § 6–4.320 ("attorneys for the government must oppose acceptance of nolo contendere pleas"); *Id.* § 6–4.123 ("The U.S. Attorney must secure Tax Division approval before expanding a Title 26 grand jury investigation to include targets not authorized by the Tax Division").

The motion to dismiss Count Two will be denied.